HOWARD B. GORHAM *vs.* MAURICE ROBINSON.

CHARLES R. EASTON *vs.* LUIGI DE PASQUALE.

AMOS LACHAPELLE *vs.* GEORGE F. TREANOR.

JAMES L. TAFT *vs.* CHARLES A. KELLEY.

AUGUST 14, 1936.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

2

4

Moss, J.    These are four petitions in equity, in the nature of *quo warranto,* brought in this court under General Laws 1923, Chapter 322, to determine as between the respective petitioners and respondents the titles to certain state offices.

The petitioners in the first two cases were on January 12, 1932, by the governor appointed respectively the justice and associate justice of the district court of the sixth judicial district of the State.    Within a few days later their appointments were confirmed by the senate and they duly qualified.    The petitioners in the third and fourth cases were on January 13 and 12, 1932, by the governor appointed the clerks of the district courts of the tenth and eighth judicial districts respectively.    Within a few days later their appointments were confirmed by the senate and they duly qualified.    All these appointments were made under the provisions of General Laws 1923, Chapter 330, as amended by Public Laws 1931, Chapter 1690.    From the establishment of these district courts by the general assembly in 1886 to the passage of this amending act in 1931, the terms of their justices and clerks had been for three years, except during a transition period of a few months.    By the amending act, they had been changed to six years.    The petitioners assumed their respective offices on February 1, 1932, the beginning of their terms, and continued until June 21, 1935, to perform the duties of these offices, to which they claim to be still entitled.

The respondents were appointed by the governor to these respective offices on June 18, 1935.    Having duly qualified therefor according to law, they entered on the performance of the duties of such offices on June 21, 1935, and excluded the petitioners therefrom.    The appointment of the respondents and their entry upon such offices were according

to the provisions of P. L. 1935, Chap. 2253, enacted at the May session. Section 1 of that act purported to so amend the above-mentioned Public Laws of 1931, Chap. 1690, that, beginning with February 1, 1932, the terms of the justices and clerks of all the district courts would be for three years, just as they had been before 1931. In other words, this section, if valid, in effect merely repealed that part of Chap. 1690 which changed the terms of such justices and clerks from three years to six years. That such was the intent of the general assembly in enacting that section is clear from its language, when compared with the chapter of the public laws being amended, although such language was not well chosen.

Section 2 of this act of 1935 provided that the term of office of every justice and clerk of a district court then holding office should terminate on May 31, 1935, but that they should continue to hold office and perform their duties until their respective successors were appointed and qualified. It also provided that the rights of any of the justices to retirement pay should not be impaired, and provided for the appointment by the governor of persons to fill the vacancies in these offices until the end of January, 1938. Some of the former justices were reappointed; the others and all the clerks were replaced by new appointees.

The ultimate issue before us is the constitutionality of this act, which by repealing a part of the act of 1931 restored the terms of the justices and clerks of the district courts to what they had been for forty-five years, and as a result thereof reduced the terms actually enjoyed by the justices and clerks appointed in 1932 to three years, four months and twenty days.

Each petitioner asserts in his petition that the act is invalid because contrary to the clear intent of Art. III of the constitution of Rhode Island, wherein it is declared that: "The powers of the government shall be distributed into three departments: the legislative, executive and judicial"; and also because the general assembly is powerless, under

the constitution of Rhode Island, to remove such justice (or clerk) during his term of office, except by impeachment.

The respondents, besides opposing these petitions on their merits, also moved that they be dismissed on the ground that they are too general and indefinite in that they do not point out any section or article of the constitution which restricts or prohibits the general assembly from cutting short, as it did, the existing terms of the petitioners. They cite and discuss several opinions of this court in which are stated strict requirements, of definiteness and particularly in the specification of the constitutional provisions alleged to have been violated, for bringing a constitutional question before this court.

This court has held that it will not pass upon the question of the unconstitutionality of an act of the general assembly, unless the party raising the issue specifically designates the particular portion of the constitution which he claims is violated by the legislative act. It is necessary to particularize to the fullest extent possible. *Blais* v. *Franklin,* 30 R. I. 413. We are unanimously of the opinion that the present petitions fail to comply with these requirements, but the question raised is of such public importance and the arguments and authorities have been so fully presented, that we deem it advisable to decide it now upon its merits. Our leniency in this instance, however, is not to be taken as a precedent. We therefore deny the motions to dismiss.

For the purposes of this opinion, we shall assume, without however deciding the question, that the petitioners who are clerks of district courts have the same status in law as the petitioners who are justices of said courts and that their cases rest on the same foundation as those of the justices.

Before entering upon the discussion of the contentions presented to us in support of the petitions, we deem it proper to state certain fundamental rules which are well settled as being those which should be applied when any court is performing its supreme and most solemn function of deciding

whether a legislative act passed by the legislative department of the same government is invalid, because it violates the higher law enacted directly by the people in the constitution.

The first of these rules is that the courts "approach constitutional questions with great deliberation, exercising their power in this respect with the greatest possible caution and even reluctance; and they should never declare a statute void, unless its invalidity is, in their judgment, beyond reasonable doubt." 6 R. C. L. 74.

The petitioners in these proceedings have the burden of establishing their contentions beyond a reasonable doubt. All laws regularly enacted by the legislature are presumed to be constitutional and valid. *Fritz* v. *Presbrey*, 44 R. I. 207. It is the duty of this court to uphold the validity and constitutionality of legislative acts until the contrary clearly appears. *LaPlante* v. *State Board of Public Roads*, 47 R. I. 258. Every intendment in favor of such validity is made by this court unless the repugnancy of the act to the constitution appears upon its face. *Manufacturers Mutual Fire Ins. Co.* v. *Clarke*, 41 R. I. 277. In the language of Shaw, C. J., in *Wellington et al., Petitioners*, 16 Pick. (Mass.) 87, 95, this court, in the performance of so solemn a duty "will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed . . . beyond reasonable doubt." This requirement that the court must be convinced beyond a reasonable doubt that the statute in question is repugnant to some provision in the constitution is stated and applied in many other Rhode Island cases. It is clearly the correct rule and will be applied by us.

The next fundamental principle which must be kept in mind by us in deciding the present question of constitutionality is that the question is purely one of legislative *power* and not at all one of *sound policy*.

The Supreme Court of the United States, in an opinion by Hughes, J., in *Chicago R. R. Co.* v. *McGuire,* 219 U. S. 549, at 569, says: "The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the question of *policy.* Whether the enactment is wise or unwise, . . . whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance. . . . 'The mere fact . . . that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power.' "

That we do not believe that any law, the constitutionality of which is brought in question before us, is in accordance with sound principles of good government cannot justify this court in holding it unconstitutional. And, as Judge Cooley has rightly said, "the validity of legislation can never be made to depend on the motives which have secured its adoption, whether these be public or personal, honest or corrupt." Cooley on Const. Law, 154. These are matters for the electorate to consider, but not for this court.

The same distinguished authority has also laid down two other fundamental rules for cases such as the instant one, rules which we believe to be sound and amply supported by the great weight of authority. "If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it shall be found that those principles are placed beyond legislative encroachment by the Constitution." 1 Cooley, Const. Lim. (8th ed.) 349. "Nor are the courts at liberty to declare an act void, because in their opinion it is opposed to a *spirit*

supposed to pervade the Constitution, but not expressed in words. 'When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something in the *spirit* of the constitution which is not even mentioned in the instrument.' *People* v. *Fisher,* 24 Wend. 215, 220."

Unless we are convinced beyond a reasonable doubt that this Chap. 2253 violates the constitution, and unless we can definitely put our finger on the particular article or section of the constitution to which this chapter is plainly repugnant, we cannot declare this legislative act void. We must remember, as was said above, that we are dealing only with the question of the power of the legislature to enact the law. As Parker, C. J., so tersely put it in *Bohmer* v. *Haffen,* 161 N. Y. 390, at 399: "Whether the legislation was wise is not for us to consider. The motives actuating and the inducements held out to the legislature are not the subject of inquiry by the courts, which are bound to assume that the law making body acted with a desire to promote the public good. Its enactments must stand, provided always that they do not contravene the constitution, and the test of constitutionality is always one of power—nothing else." This same eminent jurist, speaking in the celebrated case of *People* v. *Lochner,* 177 N. Y. 145, 156, uttered a warning which we, as a court of last resort, may well ponder long and earnestly when called upon to set aside an act of the legislature on the ground of unconstitutionality. He said: "The Courts are frequently confronted with the temptation to substitute their judgment for that of the legislature. A given statute, though plainly within the legislative power, seems so repugnant to a sound public policy as to strongly tempt the court to set aside the statute, instead of waiting, as the spirit of our institutions requires, until the people can compel their representatives to repeal the obnoxious statute."

The statute complained of in the instant cases may give rise to such temptation. It may not appeal to some as wise or prudent legislation, but on that basis we have no warrant to declare it void. As was well said by Stiness, C. J., in *Floyd* v. *Quinn,* 24 R. I. 147, 152: "The legislature and judiciary are co-ordinate branches of the government, but both are created by the people in the constitution. The presumption is that the people trust the legislature equally with the courts, and all the more so because the legislature is more directly amenable to the people." The question before us, as in that case, is not one of the policy of the law but of its constitutionality, and as Stiness, C. J., further said, "an unwise use of power does not render the exercise of it unconstitutional." If the power to enact legislation is in the legislature, the wisdom or prudence of it is beyond our province. If it is not wise or prudent, then the people and not this court have the power to apply the necessary corrective.

In the instant cases no federal question is involved. The act before us is that of the general assembly, in which is vested by our constitution the legislative power, meaning *all* legislative power, except so far as it is limited by our constitution. *Taylor* v. *Place,* 4 R. I. 324. Therefore, according to the sound rules above stated, the burden is not on the respondents to show that the act comes within the scope of the legislative power, but on the petitioners to show that it does not. The act must stand as valid, unless we are convinced beyond a reasonable doubt, that it is contrary to a provision which is either expressly set forth in the State constitution or must, beyond a reasonable doubt, be necessarily implied from language expressly set forth therein. At page 355 of his work last cited, Mr. Cooley also says: "We look in the Constitution of the United States for *grants* of legislative power, but in the constitution of the State to ascertain if any *limitations* have been imposed upon the complete power with which the legislative department of the State was vested in its creation."

The petitioners vigorously contend that prior to 1842, when our constitution was framed and adopted, "it had become the accepted law of Rhode Island that the general assembly should not remove a judge within his stated term of office, except by address or impeachment." By address is evidently meant the method of removing a judge from office, by action of the chief executive of the government, taken at the request of the legislature, a method which has been provided for by law in England and by the constitutions of some of our states, but which, so far as we are aware, has never been known in either the colony or the State of Rhode Island.

The above contention seems to be as to what the general assembly *should* do and not what it had the *power* to do, and so relates, not to power, but to *sound policy,* with which we cannot properly concern ourselves in these cases. We have examined the materials which the petitioners have furnished to us as supporting their contention, and have found nothing in these which tends to bring into question the power of the general assembly, before our constitution went into effect, to remove any judge from office at any time at its pleasure. This court has repeatedly recognized the fact that under the charter, which constituted the fundamental law of this State prior to 1843, the general assembly was virtually supreme in the government, except so far as limited under the constitution of the United States. *City of Providence* v. *Moulton,* 52 R. I. 242, and cases cited.

The petitioners devote more than one third of their brief to statements that, prior to 1842, it had become the accepted law of Rhode Island, that judges should not be removed from office during their tenures, except by address or impeachment. In other words, they argue that an independent judiciary was already an established institution in this state, even before the adoption of the constitution, and, therefore, the convention of 1842, while it did not specifically secure that independence, considered the independence of the judiciary to be already a part of the law of the

State. Upon a careful review of the authorities cited, not necessarily confined to the passage quoted or indicated by the petitioners in their brief, we think that their contention is wholly untenable as to the point of the independence of the judiciary in Rhode Island prior to 1842. Under the charter, as is well known, all powers were lodged in the general assembly. This has been denied by some students of the charter of 1663, but against such denial is a long and unbroken record of the exercise by the general assembly of every kind of governmental power, legislative, executive and judicial. *Taylor* v. *Place, supra.* See also page 10 *et seq.* of "An Address to The People of Rhode Island to Promote the Establishment of a State Constitution," (1834) in Vol. 1, Rhode Island Constitution—E. R. Potter.

The State constitution adopted in 1843 overthrew this long established system of government. Until after several decades of experience of living under the federal constitution and well into the nineteenth century, there was no expressed dissatisfaction with the charter system. Immediately following the War of the Revolution several attempts were made to establish a constitution, principally to equalize the representation in the general assembly, but these movements seem to have had little popular support behind them.

It cannot be truthfully said that dissatisfaction with the general assembly's power over the judiciary or its assertion of judicial power itself played any part in the agitation for constitutional reform which finally resulted in our present constitution. Indeed so eminent a member of the bar as John Whipple declared before the supreme court of the United States in 1829, that the Rhode Island general assembly was "the best court of chancery in the world." *Wilkinson* v. *Leland,* 2 Peters 627, 634. It is not unfair to say that he thus spoke the opinion of a vast majority of the freemen of the State. This was admitted by Thomas W. Dorr when, as a member of a committee of the constitutional convention of 1834, he wrote the latter part of its

report entitled: "An Address to the People of Rhode Island to Promote the Establishment of a State Constitution", above cited, wherein he said, at page 57: "The subject of the judiciary, though last in the order of consideration, is not the least in magnitude and importance. In introducing this subject, it is proper to state a single fact; and we believe that no comment is required. The fact is this,—that while the most numerous portion of the present freemen are averse to any change in the judiciary, those who are now excluded from the polls are in favor of it."

The views of Dorr and his colleagues of the committee, in favor of a judiciary independent of the legislature, appointed during good behavior and assured of compensation not subject to be diminished during continuance in office, were not written into any constitution, as the convention of 1834 dissolved without proposing one. Apparently there was not much interest in the subject notwithstanding the powerful and scholarly appeal of the committee which was printed and circulated in pamphlet form among the people. In a very able reply later made to this address and to the agitation for a constitution, Judge Elisha R. Potter, in 1842, remarks that: "About this time, (1834), the whigs being out of power, some of them took up the subject of a constitution, and uniting with the friends of extension of the suffrage, formed and supported a ticket of state officers, but not getting many votes, and finding it was rather unpopular, it was dropped." Considerations on Adoption of a Constitution, page 15, in Vol. 1, Rhode Island Constitution—Potter. This was probably the constitution party whose candidate for governor in the State election of 1836 received only one hundred thirty-five out of a total of seven thousand and fifty-one votes cast, despite the fact that he was a former lieutenant-governor of the State for several years. Rhode Island & Providence Plantations, Vol. 1, 329—Field. That party, meeting with no better encouragement in the next election, thereafter ceased to exist.

Ten years previously, a constitutional convention which had assembled at Newport, June 21, 1824, adopted a pro-

posed constitution which in its very first article provided that the powers of government should be distributed into three distinct departments and that no person belonging to one of these departments should exercise any of the powers of either of the others. This document also set up one "Supreme Judicial Court", and a "Circuit Court of Common Pleas and General Sessions of the Peace", as constitutional courts and specifically provided that the judges of said courts should be removed only by impeachment or on a joint resolution of both branches of the legislature, two-thirds of the number elected to each branch concurring therein. In the latter proceeding, it required that the causes of removal and the names of members voting should be recorded upon the journal of each house.

This constitution was submitted to the freemen for their approval in October 1824, and was rejected by almost a two to one vote of 3206 nays and 1668 yeas. Field's History of Rhode Island, Vol. 1, 311. Apparently the cause of an independent judiciary had few friends in the State at that time, as the only worthwhile changes proposed by this constitution were almost exclusively confined to that department of the government. Yet it has come down to us that the people of that day thought that this constitution did not make any desirable changes in the government, although it provided a much greater degree of independence for the judiciary than our present constitution. This certainly does not bear out the petitioners' contention that the people were interested in the establishment of a really independent judiciary. The plain fact of the matter is that the freemen who held the voting power were not yet ready to divest the legislature of its judicial power or of its control over judicial offices any more than they were ready to admit to the franchise those who were excluded therefrom for lack of a freehold qualification.

The reception given to this proposed constitution and the abortive action of the 1834 convention, ten years later, thoroughly dampened the ardor of the constitutionalists

for almost another decade. The agitation was renewed in 1840 on a spectacular scale. The proponents of reform then no longer confined their efforts to learned essays on government but "went in for mass meetings, parades, songs and barbecues after the manner of electioneering, which was then prevalent in the western parts of the country", but which seems not to have obtained in Rhode Island until the presidential election of 1840. As a result, in January 1841, the general assembly called another constitutional convention to convene in November of that year. In February 1842, this convention adopted the so-called Landholders Constitution, which provided for a judiciary substantially as in our present constitution. The work of this convention was disapproved by the people.

In the meantime the constitutionalists had held a convention without authority of law and adopted the "People's Constitution", which provided in some measure an independent judiciary. It is probably not too much to say that the influence of the people's convention had a great deal to do with the inclusion of the judiciary article in the Landholders Constitution. Until this time the landholders had been opposed to any change, whereas the leading spirits of the people's convention had been agitating for an independent judiciary for more than a decade. The final draft of the People's Constitution had been adopted November 18, 1841, and was in the hands of the delegates to the landholders convention when they reconvened in February 1842.

The first draft of the Landholders Constitution was referred to a committee to consider the matter while the convention was in recess from November 13, 1841 to February 1842. The expressed object of this recess was to enable the delegates to return to their homes and consult their constituents before taking final action on this draft. When the committee reported in February after the recess, it recommended the insertion of Art. III of the distribution of powers almost verbatim as the same appeared in the people's constitution, adopted November 18, 1841, while the

landholders convention was in recess. The convention declined to approve this recommendation of the committee in full. It rejected the second section which provided: "Sec. 2. No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in cases herein expressly directed or permitted." See Vol. 2, Rhode Island Constitution—Potter. This constitution was also rejected by the freemen.

Then came the "Dorr War" which, while it accomplished nothing directly, had a potent indirect influence upon the freemen and upon the general assembly, which called another constitutional convention to meet in September 1842. It completed its work at East Greenwich on November 5, 1842, and later, in the same month, the voters ratified the constitution which it had adopted and which is our present constitution.

This constitution is largely a revision of the rejected Landholders Constitution. As a concession to those who had long advocated the distribution of the powers of the government, Section 1 of Art. III of the people's constitution was incorporated in this constitution, but Sec. 2 of Art. III of the people's constitution was not incorporated. Apparently the delegates, many of whom were members of the general assembly, were not willing, by constitutional decree, to deny to a person holding office under one department the privilege of holding another office in a different department. After the constitution had been accepted, the general assembly went on much as before, exercising all the powers it had formerly exercised, *including the judicial power,* and no one seemed to think anything of it until fourteen years later, when this court, in *Taylor* v. *Place, supra,* specifically declared that the *exercise* of the judicial power was prohibited to the general assembly.

We have no doubt that the general assembly prior to the adoption of the constitution had the power to remove any of the judges at any time; and as to the principles of the

separation of powers and of the independence of the judiciary, we cannot see that they were given much recognition under a system of government in which all the judges of the highest court were annually elected by the general assembly, which also claimed and, whenever it chose, *exercised* the power to adjudicate cases and to reverse the decisions and judgments of the Supreme Court. Our decision in the instant causes must be absolutely governed by our construction of the pertinent provisions of the constitution in its present form, as such construction is arrived at from the express language of such provisions and from the plain and necessary implications therefrom. From our examination of the historical authorities cited by the petitioners, we are convinced that an independent judiciary did not exist in this State prior to the adoption of the constitution.

We therefore proceed to a consideration of the constitutional provisions relied on by the petitioners. The first one is found in Art. III under the title "Of the Distribution of Powers." "The powers of the government shall be distributed into three departments; the legislative, executive and judicial." It is noteworthy that this does not say "independent departments"; and in fact they have never been independent. Article VII, Section 1, begins as follows: "The chief executive power of this state shall be vested in a governor." But the constitution gives him expressly very little executive power, and other parts of the constitution clearly recognize the power of the general assembly in grand committee to elect officers whose choice is not expressly provided for in the constitution. For many years practically all such officers of importance were so elected, including officers whose functions pertain wholly to the executive department, which was clearly not made by the constitution independent of the legislative department.

By Art. IV, "Of the Legislative Power," the legislative power is vested in the general assembly; and, following the reasoning of this court in its famous opinion by Ames, C. J., in *Taylor* v. *Place, supra,* this means *all* the legislative

power, of which it is not clearly deprived by other language in the constitution. So also by Art. X, "Of the Judicial Power," it is provided: "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish." In the above cited opinion by Ames, C. J., at page 336, he defined the meaning of "judicial power" with reference to this very provision, by saying that "it may safely be said, that to hear and decide adversary suits at law and in equity, with the power of rendering judgments and entering of decrees according to the decision, to be executed by the process and power of the tribunal deciding, or of another tribunal acting under its orders and according to its direction, *is* the exercise of *judicial* power, in the constitutional sense."

He also points out a distinction from legislative power as follows, at page 337: "The judicial power is exercised in the decision of *cases;* the legislative, in making general regulations, by the enactment of laws. The latter acts from considerations of public policy; the former is guided by the pleadings and evidence in the case." In *State* v. *Town Council of South Kingstown,* 18 R. I. 258, at 262, this court quotes with approval from Cooley on Const. Lim. as follows: "To declare what the law is or has been is a judicial power; to declare what it shall be is legislative."

It is clear to us that the determination of the question who shall be the judges and other officers of the courts from time to time, or the *decision* of how that question shall be determined is no necessary or usual part of the exercise of the judicial power. Deciding that question and all that is incidental to it is clearly within the domain of legislative power, except so far as otherwise clearly provided in the constitution. In Art. X, Sec. 4, it provides for the election of judges of the Supreme Court by the two houses in grand committee. How the personnel of "such inferior courts as the general assembly may, from time to time, ordain and establish," shall be determined is left entirely unregulated

and therefore with the general legislative power of the general assembly for its determination, except so far as such determination may be regulated or restricted by the constitutional provisions as to impeachment, which we shall discuss *infra*. If the framers of the constitution had really intended that the judicial department, as to its personnel, should be *entirely* independent of the legislative department, it would have provided for election by the people or appointment by the governor.

From these considerations we conclude that Art. III does not by necessary implication prohibit or limit the power of the general assembly to shorten existing terms, fixed by itself, of justices and clerks whom it had the power to choose, of inferior courts which it had previously established by statute.

The next main question to be considered is whether this power is prohibited or limited by the other constitutional provisions relied on by the petitioners. But before discussing them a fundamental general principle relating to the tenure of office of State officers chosen by the general assembly or appointed under the authority of an Act of the general assembly should be noted. This general principle is that such a State officer has no contractual right or property interest in his office and, in the absence of a constitutional provision protecting him, he has no vested interest of any kind in his office. Throop on Public Offices, § 19, states that it is well settled in the United States "that an office is not regarded as held under a grant or a contract, within the general constitutional provision protecting contracts; but, unless the constitution otherwise expressly provides, the legislature has power to increase or vary the duties, or diminish the salary or other compensation appurtenant to the office, or abolish any of its rights or privileges, before the end of the term, or to alter or abridge the term, or to abolish the office itself." See also Mechem on Public Officers, §§ 389, 857, to the same effect. This principle is supported by the overwhelming weight of authority

outside of Rhode Island, and we have found nothing inconsistent with it in this State. Indeed it does not seem to be denied by the petitioners.

It is also a general principle that one legislature is competent to repeal or modify any Act of a former legislature, and that one legislature cannot abridge the power of a succeeding legislature. While this general principle is subject to certain exceptions, such exceptions depend entirely on constitutional limitations of the legislative power. 25 R. C. L. § 162, "Statutes." Such an exception is that frequently found in constitutions restraining the legislature from interfering with the compensation and tenure of certain specified public officers. A constitutional limitation, of this character, on the power of the legislature over the judicial department, is to be found in every State constitution. The one most familiar, and which has often been used by State constitutional conventions as a model, is the provision of Art. III, Sec. 1, of the United States Constitution as follows: "The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation which shall not be diminished during their concontinuance in office." There the constitution not only limits the power of congress over the compensation of all the judges exercising the judicial power under that article, but also fixes the tenure of all such judges.

This express language settled the federal fundamental law on this subject and efficiently enforced and protected the independence of the federal judges. The United States Supreme Court has been confronted rather with the question as to whether courts set up from time to time by congress are constitutional courts under Art. III, Sec. 1, of the United States Constitution and, therefore, within the protection of the language above quoted guaranteeing the compensation and the tenure of the members thereof, or are legislative courts subject to the will of congress. *O'Donoghue* v. *United States,* 289 U. S. 516; *Ex parte*

*Bakelite Corp.,* 279 U. S. 438; *Keller* v. *Potomac Elec. Co.,* 261 U. S. 428; *Kendall* v. *United States,* 12 Pet. 524; *The "City of Panama",* 101 U. S. 453; *Clinton* v. *Englebrecht,* 13 Wall. 434; *American Ins. Co.* v. *Canter,* 1 Pet. 511; *McAllister* v. *United States,* 141 U. S. 174. There is now a definite line of authority marking off the boundary between courts established pursuant to Art. III of the constitution and those established under the general legislative power of congress independently of that article and section, although some blurring of the line has probably been caused by the division of the court in the *O'Donoghue* case, wherein the minority indirectly charges the majority with unsettling the law in respect to the courts of the District of Columbia.

The point to be kept in mind here for the purpose of determining the question raised in the instant cases is that the controversies which have arisen in the Federal Supreme Court have revolved around the question of what is a constitutional court under the federal constitution. In so far as questions of tenure or compensation of the judges were concerned in any of those cases, it was only necessary for the court to decide whether the particular court was a constitutional court or a legislative court. If found to be the former, then it followed as of course that both the compensation and the tenure of the judges were beyond the power of congress, *because of the express language of Art. III, Sec. 1,* above quoted.

We have something more to consider in the instant cases. Whether the district courts are or are not constitutional courts under the judiciary article (Art. X) of our State constitution matters little in answering the question raised here. The petitioners rely strongly on their contention that the district courts are constitutional courts. From this they argue that the legislature is powerless to remove the judges during their tenure of office by amending the statute under which they received their appointments and hold their offices. In support of this contention, they cite

some of the above-mentioned federal cases. They disregard the fact that in our State constitution there is no provision of any kind similar to the provision in Art. III, Sec. 1, of the United States Constitution, whereby the inferior courts as well as the Supreme Court are protected in the compensation and tenure of the judges. Our constitution guarantees such protection *only to the Supreme Court.* (Art. X, Secs. 4 and 6.)

Can we find that the general assembly, notwithstanding the absence of any express limitation in the constitution, is impliedly prohibited from shortening the existing terms of district judges? We think such a finding would be wholly unwarranted. We must accept the constitution as it is written and not seek to write into it by construction a prohibition on the legislative power, when such a prohibition is not clearly and necessarily implied from some express and explicit declaration or delegation of power in the constitution. We find no such prohibition, express or implied, and therefore must assume that, by the language which they used in framing Art. X, the framers of our constitution did not intend to limit the power of the legislature over the inferior courts with respect to the tenure of the judges of said courts

Our constitution, as we have said elsewhere, was the product of the most disturbed and violent political struggle in the history of the State. Those who had the political power did not want to surrender the old royal charter for a new written constitution. They thoroughly believed in the wisdom, the goodness and the political soundness of the system of government which had evolved from the charter and by which the legislature had become the supreme power in the State. They looked askance upon a constitution that would reduce this department to a plane of equality with the executive and judicial departments. They firmly, if mistakenly, held that the general assembly was the best guardian and protector of the liberties of the people and, therefore, could with safety be intrusted with

all the powers of government. When they came to frame our constitution, it was in circumstances that might, in a sense, be called political duress. What they yielded to the advocates of a written constitution, after the grand model of the federal constitution, they did so scantily and reluctantly, seeking in divers instances to retain power in the general assembly, notwithstanding grants of the same power to other departments of the government.

There were two things they stoutly refused to do, and made no pretense of seeming to do. They refused to vest the executive department with full executive powers or to guarantee the independence of the judicial department. This latter object had been clearly and positively attained in the federal constitution by one short comprehensive declaration in the second sentence of Art. III, Sec. 1, as follows: "The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office." The framers of our State constitution flatly rejected it.

They knew that this was the constitutional limitation upon the power of congress that placed the personnel of the judicial department beyond the reach of the legislative department, and effectually secured their independence. This was common knowledge to all and not merely the learning of lawyers. Hamilton, in support of this provision, had written in number 78 of the Federalist papers: "The complete independence of the courts of justice is peculiarly essential in a limited constitution." And in number 79: "Next to permanency in office, nothing can contribute more to the independence of the judges, than a fixed provision for their support. . . . The enlightened friends of good government, in every State have seen cause to lament the want of precise and explicit precautions in the State constitutions on this head. . . . This provision for the support of the judges bears every mark of prudence

and efficacy; and it may be safely affirmed, that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States, in regard to their own judges." In the Virginia constitutional convention of 1829, John Marshall, sitting as a delegate, had argued strongly for a simliar provision to secure the independence of the judges of that State and his views were given wide currency. Judge Story, in his commentaries on the constitution, had written: "Without this provision (as to undiminished compensation), the other, as to tenure of office, would have been utterly nugatory, and indeed a mere mockery." Chancellor Kent, in his commentaries, which were published in 1826, had written in like vein.

It is, therefore, not too much to say that in 1842, when our constitutional convention assembled to undertake the important and, we may say, imperative duty of writing our State constitution, it was universally acknowledged that the independence of our federal judges was secured by this provision of Art. III, Sec. 1, of the federal constitution and none other. If the framers of our constitution had intended to secure a like independence for our state judiciary here, this was the prudent and efficacious way to do it, as Hamilton had said. They were willing, it seems, to emulate the example of those who framed the federal constitution and provide as they did that: "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish" (Art. X, Sec. 1), but they were quite unwilling to go the rest of the way and adopt the language that Hamilton, Marshall, Story and Kent had long before declared to be so aptly designed to secure the complete independence of the judiciary. Why? The answer must be that they did not desire that result. They were willing to remove from the legislative department judicial powers and vest them in the courts, but they were

not willing, apparently, to put any of those courts, not even this court, beyond reach of the general assembly.

Let us see what they did. Prior to the constitution, the judges of all courts were elected annually by the general assembly, their compensation was subject to the control of the general assembly and there was no limitation on the general assembly's power to remove them. The convention interfered with this system but slightly and then only as to this court. It continued in the general assembly the power to elect as theretofore, but provided that each judge .of the court should hold his office until it was declared vacant by a resolution concurred in at the annual session for the election of public officers by a majority vote of all the members elected to each house. This has been mistakenly called removal by address. It is nothing of the kind. Removal by address is merely a formal request of the legislative department, addressed to the executive department, that an officer appointed by the latter department be removed by that department. Our constitution vested the election of judges in the grand committee of the legislature; therefore, there was no room for the method of removal by address to operate here.

This power of removal is something very much more potent than removal by address and really had the effect of retaining in the general assembly a great part of its former power of electing judges of the Supreme Court annually, if it chose to do so. The framers of the constitution provided, however, in Art. X, Sec. 6, that the judges of this court should receive an undiminished compensation during their continuance in office. This was but a small concession to the independence of the supreme judiciary, in view of the precarious tenure which was provided in Sec. 4. But, small as it was, both in tenure and compensation, it was considerable compared with the former status of the court, and was generous compared with the studied neglect to provide any constitutional protection whatever to the judges of the inferior courts.

It has been argued to us, however, that there is what we might term an *implied* independence of judges of the inferior courts, such as the district courts, who have been appointed for stated terms in accordance with the statute establishing such courts. If we understand it correctly, the argument runs something like this: Since the district courts are established under and by virtue of Art. X, Sec. 1, of the constitution, they are vested with a part of the judicial power under the constitution and are therefore in that sense constitutional courts, the judges of which cannot be removed from office before the term for which they were appointed under the statute has expired; and that an act which reduces their terms is unconstitutional and void. We have found no authority for such a doctrine and none has been cited to us. We think it is based upon a misconception of what language in the federal and other State constitutions secures the independence of the judges appointed under them.

The mere fact that the constitution vests the judicial power in courts named therein or authorized to be established thereunder does not, without more, guarantee the tenure of the judges of such courts and prevent the legislature from shortening or enlarging their term of office. If such a prohibition is intended, it must be expressed as was done in the federal constitution. That this is necessarily the correct view is evident from the expressions of eminent judges of the courts of last resort in the several States from the earliest days down to our own day.

In *Conner* v. *City of New York*, 2 Sanford, 355, it was said: "Hence, it is only where the constitution defines the tenure, the mode of appointment, or the compensation, that the legislature is precluded from altering either, or from abolishing the office itself." And it was further said, at page 369: "If the office itself be secured by the constitution, and the compensation be left to the legislature, it may be increased or diminished so as to affect the incumbent, whether the compensation be by fees or by salary, as the

public good may require." Also the court went on to say: "Offices created by the constitution, the tenure and compensation being fixed by a statute, are equally within the legislative control as to such tenure and compensation; except that the office could not be virtually abolished by a colorable reduction of the compensation, or by taking it away altogether."

This decision was affirmed in 5 N. Y. 285, and in the course of the opinion, RUGGLES, C. J., took occasion to say, at page 294: "The manifest object of these prohibitions was to secure the independence of the executive and judiciary, and to prevent the exercise of undue influence by one of the great departments of the government over the others. Before these prohibitions were ordained, the power of increasing and diminishing the salaries of the governor and the justices of the supreme court had been exercised at the pleasure of the legislature." And he proceeded to point out several instances where this was done, even where the office was held during good behavior. He added: "They were frequent, and their legality never questioned. This unquestioned exercise of power until the adoption of the constitution of 1846, and its partial and limited prohibition by that instrument, leave no doubt of the legality of its exercise in all cases to which the prohibition does not extend." Later on he made it clear beyond all question that everything depends upon express prohibitory language in the constitution, when he said: "The constitution fixes the term of the plaintiff's office, but it does not prescribe his compensation, nor guaranty that it shall remain during the term as it was when he was elected. It leaves that subject to the legislature, and when the plaintiff accepted the office of clerk, he must be supposed to have known that the legislature had the power to regulate and change his compensation, as the public interests might require. These principles are settled and established by the cases referred to in the able and learned opinion of the court be-

low." This language, of course, applies with equal force to legislative action which diminishes the term of office.

If the constitution does not prescribe the tenure but leaves it to legislative action, then the legislature is free to deal with the matter according to its wisdom and understanding of the public welfare. It was because of fear and distrust entertained by the framers of our federal constitution, that the national legislature might not always deal wisely in the matter of providing for the judiciary, that they placed in the constitution the explicit provision that the judges of both the supreme and inferior courts should hold their offices during good behavior, and that their compensation should not be diminished during their continuance in office. The framers of our State constitution entertained no such fears of the general assembly. On the contrary, as we have seen from historical citations above referred to, they trusted that department more than the others.

In *Ex parte Lambert,* 52 Ala. 79, the court held that the legislature had the power to diminish the compensation of a constitutional office where the constitution did not expressly protect the compensation. It said: "In the absence of express inhibitions in the state Constitution, the legislative power is in this respect supreme."

And so, in Maine, it was declared: "The term of official existence may be made longer or shorter, or the office itself may be abolished, as the public necessities may demand. As an office may be abolished, so its emoluments may be increased or diminished, except in the special cases where it is forbidden so to be done by the constitution. In this State it is so forbidden, in reference to the justices of the Supreme Judicial Court. . . . Except in this special case, the necessary inference is that the legislature have the absolute power over the compensation of public officers." *Farwell* v. *City of Rockland,* 62 Me. 296. The same court said, in *Prince* v. *Skillin,* 71 Me. 361, at 365: "All offices, except when the legislative authority is limited or restricted

by constitutional provisions, are subject to the will of the legislature. There is, with the above exception, no vested right in an office or its salary. The office may be abolished. The mode of appointment may be changed. The length of time of official existence may be shortened."

In *The People* v. *Olson*, 245 Ill. 288, the court said that the well-known rule is that where an office is created by the legislature it is wholly within legislative control. And in deciding the special matter before it the court declared, at page 297: "We do not see how it can be said that courts are in any proper sense provided for by the constitution when such courts may never be created, but it is entirely optional with the legislature whether they or their officers shall ever have any existence. So far as providing for them is concerned, the most that can be said is that the provision is made for their creation by the legislature, and if created they are of legislative origin."

In *Collins* v. *Russell*, 107 Ga. 423, the court said: "There can be no question about the proposition that the legislative power of the State is absolute with respect to all offices that it creates, where no constitutional restriction is placed upon its power with reference to such offices." After citing authority, it refused to discuss the principle further, as it declared it to be well settled.

It is obvious therefore that this omission to give to the judges of the inferior courts of this State any constitutional protection whatever against action by the general assembly as to their continuance in office or as to their compensation was intentional and deliberate. In view of this and the general rule as to the tenure and compensation of incumbents of offices created by the legislature being dependent on its will, we are not justified in holding the act in question to be invalid, unless it can be found by clear implication from the constitutional provisions as to impeachment.

At the end of Sec. 4 of Art. X of our constitution, immediately after the language above quoted from that section, is this sentence: "But a judge of any court shall be re-

moved from office if, upon impeachment, he shall be found guilty of any official misdemeanor." And Art. XI, "Of Impeachments", after expressly providing for the manner in which impeachment proceedings shall be brought, tried and decided, provides as follows: "The governor and all other executive and judicial officers shall be liable to impeachment; but judgment in such cases shall not extend further than to removal from office. The person convicted shall, nevertheless, be liable to indictment, trial and punishment, according to law."

The petitioners contend that from these provisions, in any case where there is no express provision for the removal of an officer otherwise than as the result of impeachment, there is a clear implication that such officer cannot be removed in any other way. This reasoning is the attempted application of the maxim, *"Expressio unius est exclusio alterius."* As stated in language approved by us in *Opinion to the Governor*, 55 R. I. 56, 70, this maxim "is more applicable to deeds and contracts than to a constitution, and requires great caution in its application, in all cases." It is particularly inappropriate in the instant cases, for two reasons. One is that its application would produce the very unreasonable result, which could hardly have been intended, that a judge of the lowest of the inferior courts could only be removed for an "official misdemeanor" upon impeachment by the house of representatives and a trial and conviction in the senate by a two-thirds vote of the members elected, while a judge of the Supreme Court could also be removed, *without trial and without any cause whatever,* by a simple concurrent vote of a majority of the members elected to each house.

The other reason is the special wording of the above-quoted provision in Art. X, Sec. 4. Under this section the constitution itself prescribes the punishment to be inflicted if a judge of any court is found guilty, upon impeachment, of an official misdemeanor. The language is plain and unequivocal, and is mandatory and the court of impeach-

ment has no discretion in the matter. The situation is different where a public officer, other than a judge, is convicted. In Art. XI, Sec. 3, the constitution provides that judgment upon conviction "shall not extend further than to removal from office." Here the manner of punishment is left to the discretion of the court of impeachment with a limitation that the court shall not inflict a greater punishment than removal from office. Therefore, to our minds, the most natural and reasonable explanation for the insertion of the provision in Art. X, Sec. 4, providing for the removal of a judge by impeachment, is that it was designed to make the *removal* of a *judge* the *necessary* result of his being found guilty, in impeachment proceedings, of an official misdemeanor, while the result of such conviction in the case of any other officer might be only a suspension from his office or even only a reprimand.

We cannot find from the express language of the constitution, or by any necessary implication from such language, that it is clear beyond a reasonable doubt that the general assembly was deprived of the power which it would otherwise have to enact such a law as the one now in question before us.

The petitioners contend that the practice of the general assembly under the constitution supports their claim that it has no power to remove a judge during his term or to shorten it. This contention of the petitioners is pertinent to the consideration of the question before us if the provision of the constitution is not clear, but by reason of ambiguous language is open to several constructions. Where the language of the constitution is ambiguous, this court has said: "It is proper to seek extrinsic aid in the determination of its meaning by ascertaining the contemporaneous construction placed upon the words at the time of their adoption, and since by those whose duty it has been to construe, execute and apply them in practice." *State, For an Opinion,* 35 R. I. 166, 167. This court has also declared that: "When constitutional provisions are clear

they are imperative, both upon the legislator and the courts. When they are not clear they must be construed. But when *there are no express provisions upon a subject, they must be left to legislation . . ."* *Floyd v. Quinn, supra.* (Italics ours.) Clearly there are no express provisions in the constitution governing the question raised in the instant cases.

We think the language of Art. X, Sec. 4, and Art. XI, Sec. 3, above quoted, as related to the precise question involved in the cases before us, is not ambiguous. But since the petitioners have urged the consideration of evidence of such contemporaneous construction, we have considered it and shall briefly outline our view of it here.

We find nothing to indicate that the general assembly ever acknowledged by word or deed that it did not have the power to shorten the terms of the judges of the inferior courts, and we find considerable evidence to the contrary. On January 24, 1845, the general assembly established the Court of Magistrates, with jurisdiction within the City of Providence, to consist of seven judges, to be annually elected by the city council. In May, 1853, the general assembly by law took away from the city council the power to name these judges and conferred it on the grand committee and reduced their number to two. In June 1853, the act concerning that court was further amended by an act, Sec. 6 of which was as follows: "Nothing in this act contained, or in the act of which this is in amendment, shall be taken to prevent the removal of either member of said Court of. Magistrates and the supplying of the vacancy or vacancies thereby occasioned by a new election in Grand Committee, at any session of the General Assembly." (P. L. 1844 to 1857, 1006, 1010). The right of removal, thus clearly asserted by the general assembly, was plainly not one for cause or after any hearing. It was a right to end or shorten an incumbent's term at any time.

In 1872 the general assembly provided for a uniform system of "justice courts", one for each city and town, and

that each of the justice courts in the cities of Providence and Newport and the towns of Woonsocket and North Providence should be held by a trial justice "selected and elected from the qualified justices of the peace in such towns by the general assembly in grand committee at its May session", and that the trial justices of the other courts should be elected by the town councils. Gen. Stat. 1872, Chap. 185. Section 4 clearly asserted, as follows, the power of the general assembly to remove any of the trial justices of these courts: "Such trial justice shall hold his office for three years, unless sooner removed by the election of some other person to fill his place." In Pub. Stat. 1882, Chap. 196, Sec. 5, there was a similar provision as to trial justices of the justice courts elected by town councils, that the town council "may remove at any time any trial justice and elect another in his place."

The justice courts were superseded in 1886 by the present twelve district courts, which were created by P. L. 1886, Chap. 597, with substantially the same jurisdiction, except territorially. The last trial justices of the justice courts were elected in 1885 for three-year terms, which were terminated in 1886 by the election and commissioning of the justices of the district courts under the new act, only a very few of these trial justices being among the newly elected justices. No one seems to have questioned the power of the general assembly thus to cut short the existing terms of these trial justices, whether elected by the general assembly or by the town councils.

Sec. 3 of Chap. 597 was as follows: "Such court shall be held by a justice who shall be elected by the general assembly in grand committee at its May session, and who shall hold his office for the term of three years, unless sooner removed by the election and qualification of some other person to fill his place." There was a similar provision as to the removal of the clerks of these courts, who were also given terms of three years. These provisions were retained until 1893, when in the "judiciary act", which

made many changes in the judicial system of the State, the express statement of this right of removal was omitted. This omission is, in our judgment, of no consequence, in so far as the existence of a constitutional power in the legislative department to make such a removal is concerned. The express reservation of the power in the statute would not be of any effect, if the power did not in fact exist under the constitution, and, conversely, the omission of such an express reservation is of no effect to abrogate the power. The long assertion of it, however, from 1845 to 1893, and full acquiescence in it by the people, indicates a contemporaneous and long-continued construction of the constitution favorable to the existence of the power. The mere omission of the general assembly to continue the assertion in 1893, on the other hand, does not show any legislative construction to the contrary. At most it merely indicates that the legislature of 1893 did not care to continue the assertion of this power in the manner of its predecessors, but it does not show that the power itself was abandoned or the lack of it acknowledged by the legislature. Its continued express assertion may well have been considered unnecessary after the long lapse of time from 1845 to 1893, during which time it was continuously asserted and never questioned.

Surely if, under the constitution, the general assembly had no power of removal of judges of the inferior courts, because removal through impeachment was made by the constitution the exclusive method of removal, the general assembly could not give itself any such power by setting it forth in the act providing for a judicial office and its tenure.

The act of 1886 provided as follows: "Sec. 9. Whenever a justice or clerk of a district court shall neglect or be unable to serve, or shall become disqualified to serve, and such neglect, inability or disqualification shall continue for the period of sixty days the office of such justice or clerk may by the governor be declared vacant." Such a provision has been in force ever since. It seems to leave the

removal for such a cause to the discretion of the governor, and with no provision for a judicial determination before the removal.

So also in P. L. 1922, Chap. 2224, the governor was given the power to declare vacant the office of a justice or clerk of a district court who wilfully neglects or refuses to account for funds received. A complaint and a hearing are provided for, but the procedure is entirely different from that of impeachment. This provision also still exists. It must be obvious that both of these provisions for removal are entirely inconsistent with the petitioners' contention that the only constitutional method of removing a justice of a district court is by impeachment. The same thing also seems to us to be true as to the provision of the act creating the Superior Court—Court and Practice Act, 1905, Chap. 2, Sec. 5—and still existing, that the justices of that court "shall hold their offices during good behavior, unless removed on impeachment or by concurrent resolution passed by three-fifths of the members elected to each of the houses of the general assembly", after notice of the cause of removal and an opportunity to be heard. The petitioners admit that this provision is inconsistent with their position, but they seek to avoid its necessary and logical effect on their contention by asserting that it is unconstitutional. Such an assertion, however, does not avoid the clear effect of this legislation as further evidence of an uninterrupted construction of the constitution favorable to the existence of the power claimed by the legislature.

In our judgment the whole conduct of the general assembly with regard to statutory provisions for the removal of justices of the inferior courts or the substitution of others in their places during their original terms very strongly supports the conclusion that our constitution cannot reasonably be construed in such a way as necessarily to prohibit, beyond a reasonable doubt, the general assembly from enacting such a statute as is now in question before us.

The petitioners contend that there is a vital distinction between *constitutional courts* and *legislative courts;* that our district courts are constitutional courts, and that the justices of them therefore have a constitutional tenure of office which prevents the general assembly from diminishing their terms, or at least prevents it except as a result of abolishing these courts as a part of changing the system of courts. It seems to us that in so contending they are playing upon the words, *constitutional* courts.

The above distinction is frequently made in federal cases, where it has a real importance. There, constitutional courts are those which are recognized and provided for in Art. III of the federal constitution, concerning the judicial power, and they include the Supreme Court, directly created by that article, and the inferior courts which the congress may, from time to time, ordain and establish under the authority conferred on it so to do by that article. Legislative courts include two classes. The first is composed of true courts, exercising true judicial power, but created by the congress under its constitutional authority to provide for the government and administration of territory which belongs to the United States and is not included in any state. These courts function under powers derived solely from congress and not under Art. III. The second class is composed of tribunals created by congress, under its general legislative powers, to perform administrative or quasi-judicial functions. These are not true courts at all, though sometimes called courts.

The judges of all the constitutional courts, in the sense above defined, are equally protected by the federal constitution, as to their tenure of office and their compensation, whether they are judges of the Supreme Court or of inferior courts. The judges of the legislative courts have no constitutional protection whatever from the legislative power of congress, as to their tenure of office or their compensation. The equal protection of *all* the judges of the federal constitutional courts results, not merely from the

fact that the courts are all constitutional courts but from the fact that each of these judges is given, by language of Art. III that admits of no doubt whatever, the same protection, whether his court is the Supreme Court or one of the inferior courts.

Our district courts are constitutional courts in the above sense, but the judges of those courts are not protected in their compensation and tenure as are the judges of the Supreme Court, because our State constitution expressly gives such protection to the latter but not to the former judges.

The terms *constitutional courts* and *legislative courts* or *statutory courts* are also used with another distinction than the above. According to this distinction a constitutional court is one which is named or described and expressly protected by the constitution and which therefore has the protection that is there provided, or is one which is recognized by name or definite description in the constitution but is given no express protection. The latter kind of constitutional court, we believe, is generally held to be exempt from being abolished by the legislature, unless the legislature is clearly authorized to abolish it, but the judges thereof are not protected as to their tenure or compensation. All other kinds of true courts created by legislatures are legislative or statutory courts. These are not protected against legislative power, as to their personnel or their existence, unless they are given such protection by the constitution, expressly or by necessary implication which is clear beyond a reasonable doubt.

In *Boss* v. *Sprague,* 53 R. I. 1, at page 3, this court said: "The superior court is statutory in its origin and its powers are defined by statute and cannot be extended by judicial interpretation." Our district courts are also statutory in their origin and their powers are also defined by statute. Therefore they are not constitutional courts in the sense claimed by the petitioners, but statutory or legislative courts, and we cannot, by construction, throw around them and their justices a mantle of protection not given them ex-

pressly by the constitution or necessarily implied therein. This supports the conclusion that the terms of their justices and clerks are subject to the control of the general assembly, by which these courts were created and the terms of their justices and clerks were fixed.

In this connection the case of *McAllister* v. *United States,* 141 U. S. 174, is illuminating. That deals with the power of the president of the United States, under the authority of an act of congress, to remove from office a judge of a court in the Territory of Alaska, and to appoint his successor, with the advice and consent of the senate. It was held that the court was not a constitutional, but a legislative court. At page 187, the court says: "An elaborate argument, displaying much thought and extended research upon the part of counsel, has been made in support of the proposition that, upon general principles, lying at the foundation of our institutions, the judicial power in the Territories, exercised as it must be for the protection of life, liberty and property, ought to have the guaranties that are provided elsewhere within the political jurisdiction of the nation for the independence and security of judicial tribunals created by Congress under the third article of the Constitution. We have no occasion to controvert the soundness of this view, so far as it rests on grounds of public policy. *But we cannot ignore the fact that while the Constitution has, in respect to judges of courts in which may be vested the judicial power of the United States, secured their independence, by an express provision that they may hold their offices during good behavior, and receive at stated times a compensation for their services that cannot be diminished during their continuance in office, no such guaranties are provided by that instrument in respect to judges of courts created by or under the authority of Congress for a Territory of the United States.*" (Italics ours.)

At page 189, the court says: "It was insisted, at the bar, that a territorial judge, appointed and commissioned for a given number of years, was entitled, of right, to hold his

office during *that term,* subject only to the condition of good behavior. This view was not rested upon any specific clause of the Constitution but was supposed to be justified by the genius and spirit of our free institutions, and the principles of the common law. This argument fails to give due weight to the fact that, in legislating for the Territories, Congress exercises 'the combined powers of the general and of a state government.' Will it be contended that a State of the Union might not provide by its fundamental law, or by legislative enactment not forbidden by that law, for the suspension of one of its judges, by its governor, until the end of the next session of its legislature? Has Congress . . . any less power over the judges of the Territories than a State, if unrestrained by its own organic law, might exercise over judges of its own creation? If Congress may—and it is conceded that it may—prescribe a given number of years as the term of office of a territorial judge, we do not perceive why it cannot provide that his appointment shall be subject to the condition, that he may be suspended by the President, until the end of the next session of the Senate, and displaced altogether by the appointment of some one in his place, by and with the advice and consent of that body."

The petitioners in the instant cases contend vigorously that the fundamental principles of free and orderly government require that the judicial department be kept separate from the legislative department and independent of it, especially as to the justices and clerks. Therefore, it may be helpful to see how much separation and independence there have been in practice, as to the district courts and their predecessors, the justice courts, without trying to cover all cases of justices and clerks who were at the same time in the legislative department. Among others, the following have been cited to and verified by us. The same man was both senator from Woonsocket and presiding justice of its justice court for 1880-1885, resigning both positions to become a justice of the Supreme Court. As to the district

courts, a man was both associate justice in the second district and a representative for 1886-7. In the fourth district from 1886 for about fifteen years the justice was also clerk of the senate. For 1901-9 the justice was also a member of the house, rising to a very influential position therein and resigning both positions to become a justice of the Superior Court. For 1911-1918 the justice in the fifth district was also a representative, being deputy speaker for 1913-1914 and speaker for 1915-1916. For 1929-1935 the clerk of that court was also a representative.

The man who was justice of the justice court of Providence 1876-1886 and justice of the sixth district court 1886-1887 was a member of the house for 1876-1877 and for 1885-1887. Charles R. Easton, one of the petitioners, was elected associate justice of that court March 24, 1931, to fill a vacancy, and served continuously from that time, being re-elected in January 1932, until his term was ended in 1935 by the act now in question. He was a member of the house from 1923 to 1932, inclusive, being a member of the important judiciary committee and deputy speaker during the latter part of that period. He was thus contemporaneously associate justice and a very important and active member of the house from March 24, 1931, until the final adjournment of the general assembly in June 1932.

For 1907-1909 and 1910-1911 the clerk in the seventh district was also representative. In the eighth district the justice from 1886 to 1903, resigning then to become a justice of the Supreme Court, was recording clerk of the house 1886-1887 and representative 1899-1903, being deputy speaker in his last year. For 1886-1887 and 1902-1908 the justice in the ninth district was also representative. In the eleventh district the clerk for 1886-1900 was senator 1887-1889. The man who was trial justice of the justice court in Woonsocket for 1885-1886 and justice of the district court of the twelfth district for 1886-1892 was representative for 1883-1887. The justice for 1892-1898 was clerk of the house 1891-1893 and 1894-1898. The justice for 1921-1923 was senator 1921-1922.

Some of these men who were justices or clerks of these courts and at the same time members, some of them very important members, of the general assembly, or clerks of one or the other of the houses were men of high character and ability and afterwards attained very high judicial positions. Probably all the others were capable men with high principles of official conduct. Yet none of these men and others who were at the same time justices or clerks of the district courts and members of the general assembly seem to have felt any inconsistency between being justices or clerks in these courts and at the same time active and important members of the legislative department. So far as we have been informed, they were not adversely criticized for such conduct. On the other hand, we believe that in modern times, at least, there has been no instance of a member of the legislative department being a judge of any court of general jurisdiction, as the Supreme Court, the court of common pleas or the Superior Court.

The members of the senate and house and apparently the public made a sharp distinction between those other courts and the district courts, and there was much justification for it. The district courts have always had a very limited jurisdiction, both as to the kind and as to the importance of the cases that could come before them. They have had no probate or equity jurisdiction and could not issue any prerogative writs. They sit always without juries. Moreover, every decision they make can be easily taken to a higher court and then it has no effect whatever on the final disposition of the case on its merits, the trial being completely *de novo*. The office of justice or clerk has always been a "part time job", taking ordinarily only a very small part of the time of the incumbent. It has not interferred with the incumbent carrying on a general law business, except that he may not practice in his own court. For a considerable period, even the justices were not required to be members of the bar.

Obviously, it has never been considered necessary or required, constitutionally or morally, by the spirit of free institutions or the distribution of powers clause of our constitution or any other part of that document, that, so far as these courts were concerned, the legislative and judicial departments of the government be kept separate and independent as to their personnel. In view of these facts, it is . our opinion that the petitioners have very much overemphasized their contention that the cutting short of their terms, which resulted from the repeal .of that part of the act of 1931 which had increased the terms of justices and clerks from three to six years, was unconstitutional and invalid as a violation of a principle of the separation and the independence of the judicial department from the legislative department, which they insist must be read into the constitution. In saying this, we are not expressing any opinion as to whether either the holding of judicial offices by members of the legislative department, as set forth above, or the act in question before us, was or was not in violation of sound policy, which is a matter outside of our jurisdiction.

Some argument has been made that the statute in the instant cases is retrospective and therefore void. There is no merit to this contention. The general assembly is not prohibited by our State constitution from passing statutes that are merely retrospective in their operation. *The Prata Undertaking Co.* v. *State Board of Embalming,* 55 R. I. 454, 470. If such statutes impair contractual obligations or vested property rights, they are void, but the statute in question here makes neither of such impairments. As we have said above, an incumbent of a public office, as' here, has no vested property right therein and his relation to the State, as to the office is not contractual. Legislation, therefore, affecting his term, adversely to him, even though it be retrospective, is not void on that account. A close scrutiny of Chap. 2253, P. L. 1935, fails to disclose any reason for holding that it is unconstitutional because of any retrospective feature of it.

The contention has been made by the petitioner in the case of *Easton* v. *DePasquale* that the respondent therein was disqualified for appointment as associate justice of the district court of the sixth judicial district, because he was a member of the senate at the time of his appointment. But the petitioner Easton is not in a position to raise that issue, since, as we have shown above, he himself was a member of the house when he was chosen to be the associate justice of that court in March 1931, and again in January 1932. A petitioner, in order to maintain his petition in this form of proceeding, brought by him in his own interest and not by the attorney general in the public interest, must show that he himself is entitled to the office in question. The petitioner Easton would show the opposite, if this contention were sustained, and it is therefore overruled.

The petitioners have cited certain cases to support their main contention, but the ones which come nearest to doing so are some cases cited from the Supreme Court of Pennsylvania. The first one of the series so cited is *Com. ex rel. Hepburn* v. *Mann,* 5 Watts & S. 403, (1843). The State constitution then in force provided in Art. 5, Sec. 2: "The Judges of the Supreme Court and Presidents of the several courts of Common Pleas, shall, at stated times, receive for their services an adequate compensation to be fixed by law, which shall not be diminished during their continuance in office, but they shall receive no fees or perquisites of office nor hold any other office of profit under the Commonwealth." These judges were also given by the constitution of 1790 a tenure of office during good behavior, the court calling attention to the fact that these protections were given only to these judges and not to all judges, as in the federal constitution.

The court held that under these constitutional provisions the salary of the president judge of one of the courts of common pleas could not be diminished by a law, even though the effect would be only to put his rate of salary

back where it was when he was chosen to the office, after an intermediate increase. Judge Rogers, in the opinion of the court, after stating the above provisions of the State constitution, argued that public justice and security require that the judiciary should be protected from other departments of the government and should therefore have a permanent tenure of office and an adequate compensation incapable of diminution; and that "any construction, . . . which tends to defeat or nullify this fundamental and vital principle of constitutional law, must be unsound." He concluded, therefore, that the constitution should not be construed, as contended by the respondents, so as to put the relator into a worse position than the other president judges of courts of common pleas who had taken office after the above-mentioned increase of salary had been given by law.

At page 409, he asked if such a construction did not "lead to the entire frustration of the very object which the framers of the Constitution had in view, and which they have guarded with such sedulous care." At page 411, he argued that this construction contended for by the respondents "aims a fatal blow" at the complete independence of the judiciary, which he said was "a fundamental principle of the constitution." But this was all based on the express language of the constitution, and he proceeded then to show that the construction was "in the teeth of the letter of the Constitution." The decision was clearly correct and we find no support in the opinion for a contention that the judges of any court, in the absence of express provisions in the constitution to that effect, would be protected in their tenure or against reduction of their salaries by acts of the legislature.

In *Com.* v. *Gamble,* 62 Pa. St. 343, (1869), a county had been by law taken away from a judicial district, of which it had been a part, and constituted a new district, with a separate court of common please. The relator had been elected president judge for the new district and commissioned, and had entered on the performance of his duties.

The constitution at that time provided that such judges should "hold their offices for the term of ten years if they shall so long behave themselves well." There was a special provision made for dealing with cases of judicial misconduct. It was properly held that under the above constitutional provision the law could not be repealed and the relator thus deprived of his office during his constitutional term. We find nothing in the case favorable to the main contention of the petitioners in the instant cases.

In *Com. v. Mathues,* 210 Pa. St. 372, (1904), a law had been passed increasing the salaries of the judges of the courts of common pleas and increasing the number of courts and judges. The State treasurer paid the salaries of the new judges at the increased rate, but refused to do this for the judges who had been in office at the time the act was passed, because of the following provision of the State constitution: "No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment."

The case was heard first by two judges of the court of common pleas and was heard on appeal and decided by one judge of the Supreme Court, all the other six being disqualified by personal interest. All the three judges who passed on the case agreed that the constitutional provision that no law should increase the salary of any public officer after his election or appointment did not govern the cases of judges, who were covered by another constitutional provision then in force under the 1873 constitution, that: "The judges of the supreme court, and the judges of the several courts of common pleas and all other judges required to be learned in the law, shall, at stated times, receive for their services an adequate compensation, which shall be fixed by law and paid by the State."

These judges emphasized the constitutional provisions fixing the terms of the judges of the courts of common pleas at ten years and guaranteeing them an *adequate* compensation. The judge of the Supreme Court said that after

the general assembly, in accordance with authority express-
ly conferred by the constitution, had once fixed the com-
pensation of the judges of the courts of common pleas "it
becomes definitely then settled, prohibitive of decrease and
permissive of increase in case of inadequacy springing from
changed conditions." This case gives very little, if any,
support to the petitioners' main contention.

Then comes the latest case in *Bailey* v. *Waters*, 308 Pa.
309 (1932). This was a petition filed by Bailey, P. J., of
the court of common pleas for the twentieth district, to
compel payment to him of a salary of $12,000 a year, in-
stead of $9,000 as it would be under the last act of the gen-
eral assembly on the subject. The salaries were on a slid-
ing scale according to the population in the respective dis-
tricts, and this act had taken away and put into a new dis-
trict most of the population of his district, thus, if valid,
decreasing his salary from $12,000 to $9,000.

The case was first heard in the court of common pleas
by Hargest, P. J., on a motion to quash the petition, and
the motion was denied. After the hearing on appeal, the
Supreme Court, in a *per curiam* opinion, merely affirmed
the decision below on the opinion of Judge Hargest. In
this he had held that the salary of such a judge could not
be thus reduced during his term of office, although the con-
stitution then in force did not contain the clause, "which
shall not be diminished during their continuance in office",
that in the former constitutions had been contained in the
judicial provisions, as above set forth in the discussion of
*Com. ex rel. Hepburn* v. *Mann, supra,* and, had therein re-
ferred to and protected the judges' "adequate compensa-
tion."

Judge Hargest said that the prohibition against decreas-
ing such compensation, though not expressly in the con-
stitution, was there by necessary implication, emphasizing
the constitutional requirement of *adequate* compensation
and the language above quoted from the opinion of the
judge of the Supreme Court in *Com.* v. *Mathues* and the

statement by one of the judges of the court of common pleas in that case, to the effect that if the legislature had the power to reduce the salary of a judge, it might ruin the whole judicial department by reducing salaries and thus destroy the government itself.

We believe that the correct result was reached, but this last reasoning and some of the other reasoning of the opinion are not very convincing; and the case differs radically from the instant cases in the facts that the court there involved was a court of general jurisdiction, except territorially, being only subject to review by the Supreme Court; it was expressly provided for in the constitution and the tenure of office of its judges was protected and their receipt of an *adequate* compensation. In our judgment the case lends little support to the main contention of the petitioners in the instant cases.

In their reply brief the petitioners cite a number of cases which perhaps we should discuss. In *State ex rel. Birdsey* v. *Baldwin,* 45 Conn. 134, (1875), the relators had been county commissioners, under an act of the general assembly, up to the time when the general assembly passed another act repealing the first act and then, immediately afterwards, passed a third act which simply re-enacted the first act and thus provided for the appointment of commissioners. It then, by resolution, appointed the defendants as commissioners in accordance with the last act. The court admitted that if the general assembly had repealed the former act and stopped there, the offices would have been abolished and the relators, having no vested interest therein, would have had no remedy. It did not say that they could or could not have been removed from office; but it said that the attempted repeal and immediate re-enactment of the act did not amount to a repeal at all but left the offices intact, with the relators still occupying them.

In *State ex rel. Vail* v. *Draper,* 50 Mo. 353, (1873), the act in question simply shuffled the numbers of certain judicial circuits, including the one in which the relator was

judge of the circuit court, an office created by the constitution. It was properly held that the act neither ousted him from office as a judge of that court nor transferred him to the circuit to which the number of his circuit had been transferred. In *Shoemaker* v. *Township Committee*, 129 A. 432, (N. J. Supr. Ct. 1925), no question of constitutionality was involved but apparently only some question under a civil service law; and the decision was that an office of police recorder could be abolished by the township committee during the three-year term of the incumbent, who had been elected and his term fixed by the committee. *Grippo* v. *Mayor of Kenilworth,* 171 A. 494, (N. J. Supr. Ct. 1934), is practically to the same effect.

In *Riley* v. *Carter,* 165 Okla. 262, 25 P. (2d) 666, (1933), the constitution provided that: "Until otherwise provided by law, the officers of the state shall receive annually, as compensation for their services, the following sums." It also provided that the salary of the justices of the Supreme Court should be $4,000 per annum each, until changed by the legislature. The legislature under this provision later fixed this salary at $7,500 per annum, at which rate it stood, when the Supreme Court justices involved in the case were elected. The constitution also provided that in no case should the salary or emoluments of any public officer be changed during his term by any law enacted after his election or appointment; and further provided that no money should ever be paid out of the State treasury except in pursuance of an appropriation by law. The legislature had appropriated for the salaries of these justices only $6,000 each for the year in question. It was held that they must be paid at the full rate of $7,500, since the constitutional provision for their payment constituted a standing appropriation, no annual appropriation by the legislature being necessary. The distinction from the instant cases is obvious.

In *Halsey* v. *Gaines,* 70 Tenn. (2 Lea) 316, (1879), it was held, one judge dissenting, that a judge of one of the two

circuit courts for a certain circuit could be deprived of his office and his right to a salary, by an act of the legislature abolishing his court so that thenceforth there should be only one circuit court in that circuit, the usual rule; and that this could be validly done, notwithstanding the fact that the constitution provided that: "The judicial power of this State is vested in one supreme court, and in such circuit, chancery, and other inferior courts as the Legislature shall from time to time ordain and establish, and in the judges thereof."

In *State* v. *Leonard*, 86 Tenn. 485, (1888), it was held that under a provision in the constitution that the terms of judges of the inferior courts should be eight years, a county judge elected by the people could not be removed during his constitutional term by an act abolishing that office only and transferring its powers, duties and jurisdiction to the chairman of the county court, to be elected by that body; and that the fact that the legislature, in creating the judge's office, had prescribed a shorter term made no difference. In *Manry* v. *McCall*, 22 S. W. (2d) 348, (Tex. Civ. App. No. 1900), it was held that a district judge's *constitutional* term of four years could not, after he had been elected by the people for such term and entered upon it, be cut down to two years in an act changing the distribution of counties among the judicial districts.

The petitioners seem to rely particularly upon the last case cited by them in their reply brief, *Perkins* v. *The Auditor*, 79 Ky. 306, (1881). In that case the legislature had passed an act by which the salaries of two members of the judiciary would be reduced. One was a judge of the criminal court for a certain district and the other was vice-chancellor of the Louisville chancery court. The court in its opinion called attention to the fact that the jurisdiction exercised by each of these courts under the statute which established them was a part of that belonging, at the time of the adoption of the constitution, to the circuit courts, and added: "Circuit courts are established by the consti-

tution, and it is expressly provided that the salaries of the judges thereof, as well as the salaries of the judges of the Court of Appeals, shall not be diminished during the time for which they were elected."

From these facts the court, at page 309, draws its conclusion that the salaries in question could not be thus reduced, in the following language, all but the last two sentences of which are quoted in the petitioners' reply brief: "The legislature having, under express authority contained in the constitution, created these courts with a jurisdiction not inferior, except in extent, to that exercised by the circuit courts, and being in fact an essential part of such jurisdiction existing at the time the constitution was adopted, there appears no reason why the safe-guards thrown around the circuit courts should not also present a barrier to legislative interference with the salaries of the judges of such courts. Such judges are, in every essential, as much 'public officers' as the judges of the circuit courts. They are chosen by the people as circuit judges are chosen; they exercise in dignity the same jurisdiction, and are paid in the same way out of the public treasury."

The petitioners say that that case "concerned a judge of a court similar to our district courts." But in our judgment the differences are obvious, important and indeed fundamental. The legislature could not divide the jurisdiction of the circuit court into three subjects, civil common law, criminal law, and equity, have separate judges chosen to deal with these separate subjects, call the courts held by the latter judges different names from "circuit courts", and thus evade, as to these latter judges, the constitutional protection given to judges of the circuit courts. Our district courts do not "exercise in dignity the same jurisdiction" as that exercised by the Supreme Court when the constitution was adopted, but a very inferior, conditional and mostly preliminary jurisdiction, and exercise it in a very different manner.

Our attention has also been called to *The Judges' Cases,* (*McCully* v. *State*), 102 Tenn. 509, (1899), as supporting the main contention of the petitioners. There two questions were decided. The former one was whether a judge had been validly removed from his office by a concurrent resolution passed by a two-thirds vote in each house of the legislature and approved by the governor, under a provision in the constitution that a judge may thus be removed and requiring that the cause or causes of removal shall be entered on the journal of each house. In this instance the causes specified were that there was not enough judicial business to justify this judge's retention and that a reduction of judicial expenses was necessary in the interests of economy. The Supreme Court held that the provision in the constitution clearly required that the cause or causes of removal thereunder must be *personal to the judge removed,* such as his misconduct in office, mental or physical incapacity to perform properly the duties of the office, or the like. The constitution expressly provided protection to the judge against removal except for cause.

The other question was whether, under the constitution, the legislature could vacate a judge's office by abolishing his court and thus prevent him from drawing any further salary. The majority of the court, against a vigorous dissent by two judges, held that it could do so, in spite of the following provisions of the constitution: "The judicial power of this state shall be vested in one supreme court, and in such circuit, chancery and other inferior courts as the legislature shall from time to time, ordain and establish; in the judges thereof, and in justices of the peace. . . . The judges of the circuit and chancery courts, and of other inferior courts, shall be elected by the qualified voters of the district or circuit . . . Term of service shall be eight years. . . . The judges of the supreme or inferior courts, shall, at stated times, receive a compensation for their services, to be ascertained by law, which shall not be increased or diminished during the time for which they

are elected. They shall not be allowed any fees or perquisites of office nor hold any office of trust or profit under this state or the United States."

Whether we agree with the majority or minority of the court on this latter question, we cannot see that the opinions on either of the questions involved support the main contention of the petitioners in the instant cases, nor do we find it supported by *any* of the cases cited by the petitioners.

The attorney general and the respondents, in their briefs, have submitted for our consideration a great many cases. The following seem to us to be helpful enough to justify their citation and discussion. *Perkins, Treasurer, v. Corbin, Judge,* 45 Ala. 103 (1871); *Drake v. Beck,* 129 Ga. 466 (1907); *People v. Lippincott,* 67 Ill. 333 (1873); *Crozier v. Lyons, Auditor of State,* 72 Ia. 401 (1887); *Albach v. Benson,* 92 Kan. 1036 (1914); *State v. Pinger,* 50 Mo. 486 (1872); *Kenny v. Hudspeth,* 59 N. J. L. 320 (1896); *Koch v. Mayor of New York,* 152 N. Y. 72, 46 N. E. 170 (1897); *State v. Wright, Auditor,* 7 Oh. St. 333 (1857); *State v. Kalb,* 50 Wis. 178 (1880).

In *Perkins, Treasurer v. Corbin, Judge, supra,* the constitution provided: "The judicial power of the State shall be vested" in certain named courts and "such persons as may be by law invested with powers of a judicial nature." It was argued for the judge whose court, the city court of Selma, had been abolished by the law the constitutionality of which was in issue, that under this provision "The investiture of power proceeds *directly from the people* and creates a great co-ordinate *department* in the State"; and that from this it follows that even a judge of an inferior court, not mentioned in the constitution, could not be deprived of his position as a judge and his right to a salary during his term of office, even by an act of the legislature for abolishing his court. The argument is very similar to that made in behalf of the petitioners in the instant cases, and the situation is similar in this respect, that in the Alabama

constitution the court in question was not named, but it had been created by law, and the salaries of its judges were not expressly protected.

The court decided against the judge on two distinct and equally decisive and important grounds. The former was that the act under which he had been elected to his office was invalid; the latter was that even if he had been validly elected, the legislature had power to repeal the former act and thus abolish the office and deprive him of any right to further salary.

The court held that there were two kinds of courts, first, those created by the constitution itself and not owing their existence to legislative power, and, second, those called in the constitution "inferior courts of law and equity", which "the general assembly may from time to time establish", and which therefore derive their existence from legislative enactments; and that these enactments "are subject to repeal except when they create a contract." The court then held that no contract with the judge had been created; that therefore the law creating the office could be repealed; and that upon its repeal all rights dependent on it would expire. As the court put it, "There is no constitutional protection to the salaries of the judges of inferior courts in this State. This protection only extends to the judges of the supreme court, the circuit courts, and the courts of chancery. . . . The legislative power is supreme, unless there is an express constitutional limit."

The petitioners argue that the decision on this point is not *contra* to their main contention, because the act in question was one to abolish the office and not simply to remove the judge from the office. But the decision is based on the broad principle that, as to inferior courts created by the legislature, its power is supreme, except as expressly limited by the constitution; and if there is, as contended by the petitioners, a fundamental principle of judicial independence, which is implied, if not expressed, in all American constitutions and which nullifies all legislation violat-

ing that principle, we cannot see why depriving a judge of his office and salary in the middle of his term is not just as truly a violation of that principle, whether it is done by abolishing the office or by removing him therefrom.

Moreover, it is not correct to say, as the petitioners do, that the act involved in the instant cases was a mere removal statute. In fact the removal was a result of the repeal of that part of the legislation of 1931 which had changed the terms of judges of the district courts from three years, as they had been from the beginning of such courts in 1886, to six years. The act made a substantial change in the system of district courts.

In *Drake* v. *Beck, supra,* the court made the following statement, which apparently laid down a rule which was not strictly necessary to the decision of the case: "The city court of Griffin was created by the legislature. It was not a court which the constitution required to exist. The legislature had power to abolish the court, or to amend the act establishing it; and this could be done although it might result in shortening the terms of office of the judge and solicitor, or terminating their tenure of office and requiring successors to be elected in lieu of the officials previously appointed by the Governor."

In *People* v. *Lippincott, supra,* it was held that a judge of a city court, created by the legislature under a provision in the constitution permitting it to create such courts, could be deprived of his office in the midst of his statutory term, by the repeal of the act which created the court. The reason given was substantially the same as that given in *Perkins, Treasurer,* v. *Corbin, Judge, supra.*

In *Crozier* v. *Lyons, supra,* it was conceded by the parties, "that, in the absence of a constitutional restriction, the general assembly may abolish any office created by legislative authority." The constitution provided that "the judicial power shall be vested in a supreme court, district court, and such other courts, inferior to the supreme court, as the general assembly may from time to time establish."

It provided for eleven judicial districts. Under this authority the general assembly had divided the districts into circuits and provided for a system of circuit courts, of which the court in question was one. The constitution also provided that the general assembly, under certain restrictions, could increase or decrease the number of districts or the number of judges of the district court, but that "no reorganization of the districts or diminution of the judges shall have the effect of removing a judge from office." It was held that this provision did not protect judges of the *circuit* courts, because those courts were not named in the provision, but were created by the general assembly, and therefore could be abolished and the judges thereof thus deprived of their offices and their salaries.

In *Albach* v. *Benson, supra,* the office of a police judge was in question. The office itself apparently remained the same, but a different method of election to it was provided by a new act. Rather by way of *dictum,* perhaps, the court said: "The office of police judge in cities of the second class is one of legislative creation, and the legislature has plenary power over its existence and tenure. The office being an agency of government, established for public convenience and welfare, there is no contract, express or implied, with an incumbent, or other obligation, which deprives the legislature of power to abridge the term or to provide new or additional methods of removal."

In *State* v. *Pinger, supra,* it was held in a very brief opinion that judges of a statutory probate court could be deprived of their offices by an act which merged the probate courts with the county courts and provided for the immediate appointment of judges of the latter courts. The court said at page 487: "The plaintiffs had no vested interest in the office which would prevent the general assembly from repealing the law. It is a statutory court and a statutory office, and within the complete control of the general assembly to repeal, abolish or terminate it."

In *Kenny* v. *Hudspeth, supra,* the relator was a judge of one of the inferior courts of common pleas of Hudson coun-

ty, New Jersey, and his term had about a year to run, when the legislature passed the act in question, which cut short his term. These courts were at the time composed of law or "president" judges and other judges who were not lawyers. The act provided that the former should continue in office to the end of their respective terms but that the terms of the others should end at a fixed date, which was five days after the date of the approval of the act. It was held that the relator had no remedy. The constitution provided that the judicial power be vested in certain named courts and in "such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish as the public good shall require."

The court held that the constitutional courts were the courts that were named in the constitution and that the courts of common pleas, not being so named, but existing when the constitution was adopted, were inferior courts, which the legislature was given, by the constitution, power to alter or abolish. But the court also definitely laid down the rules and supported them by authorities, that: "An appointment to office is neither a contract nor is the office or its prospective emoluments the property of the encumbent," and that "the legislative branch of the government, whenever, in its judgment, public policy requires it, may declare the office vacant or transfer its duties to another officer, although the effect may be to remove the officer before the expiration of the term for which he was appointed." It said also: "If there be any limitation upon the power of the legislative department of the government over the tenure of public offices, it must be found in a constitutional inhibition, arising from the fact that by constitutional prescription the tenure and term of office are put beyond legislative control." There is nothing in the opinion to support a contention that these rules do not apply to judges of courts other than those named in the constitution.

In *Koch* v. *Mayor of New York, supra,* a new constitution of the state provided as follows: "Justices of the peace, and other local judicial officers, provided for in sections seventeen and eighteen, in office when this article takes effect, shall hold their offices until the expiration of their respective terms." The plaintiff had been appointed a police justice of the City of New York at a salary of $8,000 a year, for a term of ten years. About two years later and after the new constitution had gone into effect, an act was passed by which the office of police justice was abolished and new courts were created to exercise similar jurisdiction. It was held that the plaintiff had no right to draw any salary, his office being abolished, the above-quoted provision in the constitution being construed as only preventing the going into effect of the constitution from itself terminating such offices, but leaving the legislature with power to terminate them.

At page 75, the court says: "The legislature has all the power of legislation that the people of the state can grant, except as it is restained, expressly or impliedly, from the exercise of particular powers by the constitution. . . . Since power to legislate is the rule, and restraint upon that power the exception, as was said by this court in an important case, 'in inquiring whether a given statute is unconstitutional, it is for those who question its validity to show that it is forbidden.' . . . Subject only to the restrictions of the constitution, the legislature may do what it thinks best with a public office or a public officer, by abolishing the office, shortening or lengthening the term thereof, increasing or diminishing the salary and the like." It is true that in that case also the cutting short of the plaintiff's judicial term and of his salary accompanied the abolishing of the court, yet the decision was not put on that narrow ground, but on the broad ground of the power of the legislature over the office and its incumbent.

In *State* v. *Wright, supra,* the question was as to the validity of an act abolishing a court not expressly men-

tioned in the constitution. The important part of the opinion for our purposes is the following language from page 335: "The constitution has in terms forbidden the General Assembly to vacate the office of a judge of a court established by the constitution, but has not in terms placed any limit upon the powers of that body over the office of judges of courts established by itself. As to the latter, we can see no good reason to conclude otherwise than that the framers of the constitution intended to leave the power to abolish, as ample and unlimited as the power to create."

In *State* v. *Kalb, supra,* the relator was judge of the County Court of Brown county, a court of probate and of limited civil and criminal jurisdiction, created by statute with a fixed term and an annual salary of $3,500. During his term of office the legislature repealed so much of the former statute as conferred civil and criminal jurisdiction on the court and reduced the salary of the judge to $1,500. He brought *mandamus* proceedings to compel the payment of his salary of $3,500, contending that his was a constitutional court and that to maintain an independent judiciary it was necessary to guard the judges' salaries against diminution during their continuance in office.

The court held that he had no remedy, saying at page 183: "It will be seen, by an examination of the constitution, that neither the term of office nor the compensation to be paid to county judges, or judges of inferior courts, are fixed by the constitution. . . . It is well settled that, in the absence of any constitutional prohibitions or affirmative provisions fixing the term of office of any officer, or his compensation, the legislature may change such term or compensation, and such change of term or compensation will apply as well to the officers then in office as to those to be thereafter elected." The court held that this rule applied to the plaintiff.

It is true, as contended by the petitioners, that none of these cases cited by the attorney general or the respondents is a case of an act merely removing a judge from his office;

but the principles laid down in them and upon which they are decided are strongly in support of the respondents; and as noted, *supra,* the instant cases are not cases of mere removals from office, but of the shortening of terms for all the district courts, in order to restore these terms to what they had always been, for forty-five years, until 1931. In our judgment, when these cited cases and the *dictum* in *McAllister* v. *United States, supra,* are compared with the authorities cited by the petitioners to support their main contention, it is clear that the preponderance of authority against the contention is overwhelming.

To summarize the most important parts of what we have said, we find that the burden of establishing the unconstitutionality of the act in question is upon the petitioners; that to justify us in finding it unconstitutional we must be convinced beyond a reasonable doubt that it is repugnant to some provision either expressed in the State constitution or clearly and necessarily implied from language therein; and that we cannot declare it invalid because we believe it to be contrary to sound policy, nor because it appears to us to violate fundamental principles of republican government, unless we find that the principles violated are by the constitution clearly placed beyond legislative encroachment, nor because in our opinion it is opposed to a spirit supposed to pervade the constitution but not therein expressed. We find nothing in the history of the relations between the general assembly and the courts of Rhode Island, before the adoption of the constitution, which causes us to interpret its provisions any more favorably to the petitioners than we otherwise would.

We also find that the established rule in this country as to State officers, chosen by the legislature or appointed under the authority of acts of the legislature, is that such an officer has no contractual right or property interest in his office; that in the absence of a constitutional provision clearly protecting him, he has no vested interest of *any* kind in his office, or its future emoluments, and his term may be

shortened or ended at once by act of the legislature, either with or without the abolition of his office, and without any fault on his part, and his salary may be reduced or increased; and that such an act, even if it be regarded as retrospective, cannot on that ground be held unconstitutional.

We also find that in the general clause of the constitution providing for the distribution of powers, and in the specific provisions vesting powers in the several departments, there is nothing which requires that the judicial department shall be independent of the exercise of legislative power by the legislative department; and nothing which is, beyond a reasonable doubt, inconsistent with the exercise by the general assembly of a power to shorten existing terms, fixed by itself, of justices and clerks whom it had power to choose and who were officers of courts which it had previously ordained and established, and which it had the admitted power to alter or abolish.

We further find that the exercise of such power by the general assembly is not prohibited by *any* express provision in the constitution or by any clear and necessary implication from its provisions as to impeachment, or from any other of its provisions; that while the tenure of office and salaries of the judges of the Supreme Court are both expressly protected in that instrument, there is a conspicuous and evidently intentional absence of any such protection for the judges of inferior courts ordained and established by the general assembly; that the district courts are such inferior courts, of very limited and provisional jurisdiction; that from at least as early as 1853, the general assembly has asserted, apparently without objection, a wide power of control over the terms of office of the justices of these courts and of the preceding similar courts; and that, as the records clearly indicate, it has never been felt by successive general assemblies or the justices and clerks of these courts that there was any principle of judicial independence, necessarily implied in the constitution, which was

inconsistent with men being at the same time such justices and clerks and also active members of the general assembly.

Finally, we find that the preponderance of authority is overwhelming in favor of the power of a legislature to shorten existing terms or to diminish the salaries of judges of inferior courts which it has created, if such power is not clearly contrary to an express or clearly and necessarily implied prohibition in the constitution.

In view of these findings, our conclusion is that it is by no means clear to us, beyond a reasonable doubt, that the general assembly was without power to pass the act the validity of which is the decisive issue in the instant cases. The act therefore must be deemed to be valid.

All the petitions are therefore denied and dismissed.

CAPOTOSTO, J., dissenting. In determining the main question presented by these cases, so vital to the perpetuation of orderly constitutional government in this State, I regret that I cannot agree with the decision of the majority of this court which holds that the enactment of Chapter 2253, Public Laws 1935, is a valid exercise of the legislative power by the general assembly under the constitution. Neither can I subscribe to the reasoning advanced by it in support of that conclusion. Mr. Justice Baker, whose co-operation I hereby acknowledge, authorizes me to say that he concurs in this dissenting opinion.

These are petitions in equity in the nature of *quo warranto* brought in this court to determine the title of the petitioners to the judicial offices to which they were appointed for a term of six years in January, 1932. The petitioners, who duly qualified following such appointment, have served in their respective offices from the first day of February, 1932, until all were summarily removed in June, 1935, under the provisions of Chap. 2253. It is mere repetition for us to set out in detail the allegations of these petitions. The respondents have filed a motion to dismiss the petition in each case on the ground that the constitutionality of Chap. 2253 is improperly presented, according

to our well-established practice, by the record before us. The defects in form urged by the respondents might be determinative in the ordinary case, for we do not intend to depart, by our attitude in these cases from a strict observance of the rule consistently demanded by this court that one who assails the constitutionality of an act is under the duty to specifically and accurately point out the provision or provisions of the constitution which he claims are violated by the act in question. Inasmuch as the petitions in these cases strike at the very root of government by specifically charging that Chap. 2253 is in violation of Art. III of our constitution, which deals with the distribution of the powers of government, we are inclined to overlook other possible defects of form because of the great public importance of the principal question presented. The respondent's motion to dismiss in each case is therefore denied.

In construing the provisions of the constitution, our sole purpose is to ascertain the intention of the people who adopted it. It is fair to start with the assumption that those who were designated by the people to deal with the sovereign power and to distribute that power to the various departments of government were mindful of the fundamental principles of American constitutional government, and that it was their intention to perpetuate those principles in apt and plain language. It is also fair to assume that the people, when they adopted the constitution, also had these principles in mind; that they gave the language and words used in the proposed constitution their natural and obvious meaning and that they ratified the instrument with these understandings.

It is fundamental that the constitution derives its force from the people who adopted it and not from the convention that prepared it for such adoption. The meaning expressed by the individuals in a constitutional convention may be of some assistance in case of doubt, but it is not controlling, especially if the language in the constitution,

naturally and reasonably construed, conveys a different intention. A State constitution demands a reasonable construction in the light and with the assistance of the common law which still remains in force after such a constitution is adopted, except as limited by that instrument. The individual expression of opinion by members of the convention or the application of arbitrary rules of construction "are to be made use of with hesitation and only with much circumspection." Cooley, Const. Lim., Vol. 1 (8th ed.), 171.

When implications are resorted to they must be necessary and not conjectural or argumentative, especially if they lead to a construction that is in conflict with our principles of government. Implications are not warranted when, giving effect to every section and clause of the instrument as a whole and in relation to each other, the intent of the people is apparent. A construction of the instrument which will render every word operative is to prevail over one which, because of implications, will make some idle and nugatory. "That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have a right to add or to take away from that meaning." *Newell* v. *The People,* 7 N. Y. 9, 97.

Chapter 330, G. L. 1923, continues in force a system of district courts for this State. Section 1 divides the State into twelve judicial districts, and Sec. 2 provides that: "There shall be a court in each judicial district entitled the district court of the district in which it is established." Section 3 provides for the election of the judges of these courts in the month of January, 1926, and in the month of January in every third year thereafter by the general assembly in grand committee, the judges so elected to "hold office for the term of three years commencing on the first day of February next following their election." Section 4 sets forth similar provisions for the clerks of these courts. Section 1, Chap. 1690, P. L. 1931, amends Secs. 3 and 4 of Chap. 330, and provides that in January, 1932, which is at

the end of the term of the then incumbents, and "in the month of January in every sixth year thereafter, the governor, with the advice and consent of the senate, shall appoint" the judges of the district courts, an associate judge of the District Court of the sixth judicial district, and the clerks of all district courts "to hold office for the six years commencing on the first day of February next following their appointment."

Section 1, Chap. 2253, P. L. 1935, which is the chapter before us in these cases, amends Secs. 3 and 4 of Chap. 330, G. L. 1923, as amended by Chap. 1690, P. L. 1931, and by a retroactive provision enacts that *in the month of January, 1932,* the governor, with the advice and consent of the senate, shall appoint all such judges and clerks "to hold office for the three years commencing on the first day of February next following their appointment." This act was approved June 3, 1935, at which time all these petitioners had qualified and were acting as judges or clerks of the district courts for their respective districts since 1932, they having been duly appointed, as we have already stated, in January of that year for a term of six years, or until January 31, 1938.

On June 18, 1935, under executive appointments, which were confirmed by the senate, other persons, including these respondents, were named judges and clerks of the district courts for the "term ending January 31, 1938," in place of these petitioners and others. The result was that all twelve judges, one associate judge and all the clerks of such courts were removed and, by the executive appointments of June 18, 1935, only three of the original judges were reappointed; no one of the clerks was reappointed.

We believe it due to the legislature and to the people of this State to say that no personal objections existed against the petitioners in these cases; that they, equally with those who were named in 1935 to supplant them, are men of character, fully able to well and faithfully perform the duties of their respective offices. Stated in plain language,

Chap. 2253, P. L. 1935, is, in our opinion, nothing more than a removal statute which, by means of a retroactive provision, terminates the tenure of judicial officers in the middle of their terms without cause and without hearing.

This act, which is inconsistent with previous legislative practice, can be valid only if the legislature had the power under the constitution to enact such a law. The issue in this case is of serious concern to the people of this State. The struggle for an independent judiciary which they have waged for centuries and which they will probably continue to wage for many more, is a heritage of our people. They have constantly demanded that the common rights of person and property be determined under the law by men who, as judges, were controlled only by their judgment and their conscience.

The wisdom or advisability of a particular statute is not a question for this court to determine so long as the statute is within the constitutional power of the legislature and no motive or purpose, other than appears upon the face of the enactment, can or should be imputed to the legislature. We are also mindful of the fact that every intendment is in favor of the validity of a statute, unless it is clearly shown that the statute is irreconcilable with the constitution. We fully appreciate the reluctance with which courts hold enactments of the legislature void, yet it is the plain duty of the court to unhesitatingly declare an act of the legislature unconstitutional whenever a statute violates the intent and meaning of that fundamental law. The constitution, which expresses the will of the people, is above any law that merely expresses the will of the legislature and "if the two are in conflict, the law must yield and the constitution must rule." Rufus Choate Debates, Massachusetts Constitutional Convention, Vol. II, 799 at 803. The court "neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and,

having done that, its duty ends." *United States* v. *Butler*, Law Ed., Vol. 80, 477 at 487.

In our opinion the meaning and scope of Art. III of our constitution is decisive of the principal question at bar. In construing this article it is our duty to examine all other provisions in the constitution that are intimately connected therewith, and to interpret them all in the light of those principles of constitutional government upon which the constitution itself rests and which it intends to reaffirm and perpetuate. When in that article the constitution orders that the powers of government be distributed among three departments, legislative, executive and judicial, it is the people who demand that such powers be distributed amongst departments of the kind and character that were known to them and by which alone they consented to be governed. This mandate, following the rule established by American constitutions, both State and federal, not only divides the powers of government among the three departments but implicitly commands, as a conclusion logically following from the separation decreed, that they shall be forever distinct and independent from each other. See *Kilbourn* v. *Thompson*, 103 U. S. 168, 190, 191. The underlying principle of government sought to be protected and made permanent by this article of the constitution was the independence of the three branches of government, so that by working harmoniously within their respective spheres they could mantain and "preserve . . . for posterity" a free government "for the protection, safety and happiness of the people." Rhode Island Constitution, preamble to Art. I and Art. I, Sec. 2. This separation and the consequent exclusive character of the power conferred upon each of the three departments is not to be lightly treated and cast aside as merely a matter of governmental mechanism. It is basic and vital in our system of government. A departure by direct or indirect means from this fundamental conception of the constitution will seriously affect the distribution of the powers of government as ordered

by the people, and will also disturb the manner in which the people have a right to expect and demand that such powers shall be exercised, protected and preserved.

Article X, Section 1 provides that: "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish." Section 2 of that same article as amended by Section 1 of Article XII of the amendments to our constitution, gives the Supreme Court "final revisory and appellate jurisdiction upon all questions of law and equity", and then provides that "the inferior courts shall have such jurisdiction as may, from time to time, be prescribed by law." These two sections deal solely with the courts as an institution and as such institution is known in the history of the English law and in the jurisprudence of this country. Moreover, the term "judicial power" in Section 1 is to be interpreted in the light of the common law. This power includes ample jurisdiction in law and in equity to cover almost every matter, both civil and criminal, that can be litigated in a court of justice, and constitutes the very pivot upon which our entire judicial system operates. The Supreme Court and the inferior courts, therefore, are the repository of all the judicial power of the State, whether a particular court is specifically named in the constitution or is ordained and established by the general assembly in obedience to its command. The mandate of the constitution to the general assembly is to create inferior courts in which, together with the Supreme Court, the entire judicial power of the State will vest by force of the constitution.

A similar question arose in tthe case of *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, in which Mr. Justice Story, dealing with the judiciary clause of the United States Constitution—which is almost identical with ours—at page 331, says: "It would seem, therefore, to follow, that congress are bound to create some inferior courts, in which to vest all that jurisdiction which, under the constitution,

is exclusively vested in the United States, and of which the supreme court cannot take original cognizance."

The general assembly of this State is at liberty to ordain and establish a system of inferior courts from time to time which in its opinion will adequately serve the people, and to prescribe for such courts the jurisdiction which any particular unit or units of that system shall exercise. But, notwithstanding this discretion given to it by the people for their common welfare and convenience, it still remains the duty of the general assembly to comply with this mandatory provision of the constitution and to create inferior courts. When this is done, all judicial power of the State is vested directly by the constitution, and not by any act of the general assembly, in the Supreme Court and in such inferior courts as the general assembly may have ordained and established. Upon this point the court, in *State* v. *Noble*, 118 Ind. 350, at page 367, says: "The Constitution vests the judicial power in every instance, and the Legislature in none. The Legislature has no judicial power, and can confer none upon any person or tribunal. Under the Constitution it may establish courts, but it does not invest the courts with judicial power; the Constitution alone can do that, for all judicial power comes from that instrument and is vested by it in courts and judges." The advisory opinion, in 3 R. I. 299, rendered by this court to the general assembly on June 14, 1854, only twelve years after our present constitution was adopted, holds that: "An act to reverse and annul the judgment of the Supreme Court of Rhode-Island for treason, rendered against Thomas W. Dorr, June 25th, A. D. 1844", was unconstitutional. In speaking of the legislative and judicial power as distributed by the constitution, the court, at page 300 of that opinion, says: "Upon the General Assembly is conferred the exclusive power of enacting laws. Upon the Supreme Court *and the Courts inferior thereto, to be created by the General Assembly,* is conferred the exclusive judicial power." (Italics ours.) We cannot agree, therefore, with the conten-

tion of the respondents that the district courts are not constitutional courts, but that they are merely legislative courts subject at all times to the will of the general assembly in every and all matters connected therewith.

Counsel for the respondents, as well as the attorney general, in their briefs and arguments, stress the "omnipotency" of the general assembly. The use of this word, in its broad sense and without qualification, to mean that the legislative department has unlimited power is unwarranted and in direct conflict with the very fundamentals of American constitutional government. If the general assembly has any such power, then the constitution is a mere pretense and the legislature might well say, as did Louis XIV of France: "I am the State." We admit that the general assembly is all powerful in the exercise of its legislative power and of such other powers as the people may have invested it with, but in all instances it acts under and not above the constitution. In ordaining and establishing inferior courts for this State, the general assembly is only carrying out the will of the people as expressed in the constitution. The courts which it in fact institutes are the courts demanded by the constitution and not mere creatures of the general assembly. We find no force in the argument that such courts are not constitutional courts because they are not specifically mentioned in the constitution. In our opinion, they are constitutional courts because they are ordained and established by the general assembly with constitutional sanction and in obedience to an express mandate of the constitution. Whether a court is a constitutional court or a mere legislative court depends upon the character of the power that the particular tribunal is called upon to exercise. The judicial power of the State can be vested only in the courts which the constitution itself creates to receive that power, whether the system by which that power shall be exercised is specifically named in the constitution or not. Under the judiciary clause of the United States Constitution, which is almost identical with

ours, the district courts, the circuit courts and possibly the commerce courts are considered as constitutional courts, even though not specifically named. There is no legal justification for holding otherwise under the constitution of this State.

In their attempt to maintain the contention that the inferior courts of this State are mere legislative courts, the respondents compare Art. III, Section 1 of the constitution of the United States, with Art. X, Section 1 of our constitution and argue that there is a presumption that the United States Constitution was kept in mind and probably referred to, when our constitution was framed; that our Section 1 fails to deal with the judges in the same or similar manner as does that same section of the federal constitution; that such omission was intentional, and that, therefore, it was the intention of the people, when they adopted our constitution, to make our inferior courts mere legislative courts to be dealt with in the future at the will of the general assembly. We have no doubt but that the United States Constitution was not only kept in mind but also referred to and studied, and that Art. X, Section 1 in our constitution was intentionally framed as it was. We cannot agree, however, with the respondents' conclusion which disregards the rest of Art. X and other pertinent provisions in our constitution.

If one inference is permissible from a comparison of the two constitutions, then all reasonable inferences arising from such comparison should be drawn, and any inference inconsistent with the real intent of the people, as therein expressed, should be discarded as unsound. For instance, it is beyond question that the United States Constitution guarantees to the people of this country a republican form of government with the powers of the government distributed among three departments that are intended to be independent within their respective spheres. *Marbury* v. *Madison*, 1 Cranch 137. It is fair to assume that our constitution was adopted with a like intention. It is too

late to try to read into that instrument now, almost one hundred years after its adoption, an inference that the people of this State intended to give the general assembly practically unlimited control over a coördinate branch of the government which they created for the protection of person and property. If the people intended anything so inconsistent with American constitutional government, they would have said so in plain and unmistakable language. We cannot subscribe to the idea that such power is to be found in the constitution by inference, especially since it directly affects and seriously impairs that harmonious coördination between the different branches of government which all the constitutions of this country, both federal and State, aim to attain. It is conceded that under the charter of Charles II of England the general assembly had almost unlimited power. In 1842, however, the people of this State adopted a written constitution, and it is that constitution and not the royal charter of 1663 that is controlling in these cases.

Let us see if our constitution, and especially Art. X, is as silent in respect to the protection extended by it to the judges in whom shall vest the judicial power of the State as the respondents would like to have us believe. Section 4 of that article reads as follows: "The judges of the supreme court shall be elected by the two houses in grand committee. Each judge shall hold his office until his place be declared vacant by a resolution of the general assembly to that effect; which resolution shall be voted for by a majority of all the members elected to the house in which it may originate, and be concurred in by the same majority of the other house. Such resolution shall not be entertained at any other than the annual session for the election of public officers; and in default of the passage thereof at said session, the judge shall hold his place as is herein provided. But a judge of any court shall be removed from office if, upon impeachment, he shall be found guilty of any official misdemeanor."

72

Turning to Art. XI, "Of Impeachments", we find that Sec. 3 provides that: "The governor and all other executive and *judicial officers* shall be liable to impeachment; but judgment in such cases shall not extend further than to *removal from office*. The person convicted shall, nevertheless, be liable to indictment, trial and punishment, according to law." (Italics ours.) A striking difference between the constitution of the United States and the constitution of this State is that the former makes no specific provision in Art. III, which deals exclusively with the judicial power, for the impeachment and the removal from office of *any* judge for an *official* misdemeanor, while the latter contains this express provision, stated in plain and comprehensive language, in the corresponding article of that instrument. If an omission in one instrument as compared with another is to be given great weight, we fail to see why an express provision of that instrument which is not in the other should not receive equal consideration, especially when it is conducive to and not disruptive of the normal functioning of independent departments under our scheme of government.

The respondents discount this important distinction and waive it aside by saying that Sec. 4 of Art. X of our constitution, in providing that "a judge of any court shall be removed from office if, upon impeachment, he shall be found guilty of any official misdemeanor", did not intend to prohibit the general assembly from removing the judges of the district courts during their term of office by any other method which it might see fit to employ. In order to support this contention, they resort to cumulate inferences in their endeavor to sustain the constitutionality of Chap. 2253, P. L. 1935. The respondents first draw the inference that because our Section 1 of Art. X is not the same as Section 1 of Art. III of the United States Constitution, such inferior courts are not constitutional courts. Then they again proceed by way of inference and attempt to destroy the force of the impeachment clause in the judi-

ciary article of our constitution by arguing that this provision does not deny to the general assembly the power to remove, by any other method and without cause or hearing, a judge of an inferior court before his term of office has expired.

We cannot follow any such reasoning, and, in doing so, we do not rely upon the old maxim of *"expressio unius"*, for we have little faith in the efficacy of that maxim as a safe rule of interpretation, especially in construing a written constitution. The important and all-controlling question to be determined is the real intent of the people themselves as expressed by the language of the constitution, rather than to infer a meaning by the application of artificial rules of construction. Inferences are dangerous, especially if multiplied, and are to be avoided when they bring about a condition that is in conflict with fundamental principles of constitutional government and anomalous in the judicial history of this State.

To support their second inference, the respondents point to that part of Sec. 4 of Art. X in our constitution, which refers to the judges of the Supreme Court, and argue that only those judges are protected against removal from office during their term of office, unless the general assembly proceeds as therein specified or by impeachment. We do not intend to express any opinion upon the import of this provision, nor do we deem it expedient to discuss its efficacy as a protection to the judges of this court, for its application as such is now a matter of common knowledge. Attention is called to the fact that this particular provision does not fix the term of the judges during good behavior, but only states that "each judge shall hold his office until his place be declared vacant" by a resolution of the general assembly not to "be entertained at any other than the annual session for the election of public officers." In view of the fact that when our constitution was adopted the judges of this court were elected annually, it may be that this provision may have been originally intended more as

an aid to the general assembly for the expedition of its business by relieving its members from the annoyance incident to such an election, rather than as a protection to the judges themselves. Whether or not this is so, is immaterial. We believe that, in adopting said Sec. 4, the people of this State intended that a judge, exercising the judicial power of the State and whose term of office was fixed, should not be removed by the general assembly before the end of his term except by impeachment, unless the general assembly specifically reserved the power so to do. To the respondents' contention that Sec. 4 of Art. X cannot be construed to provide the only method for the removal of an offending judge, because it is confined to "official misdemeanor", our answer is that under Sec. 3 of Art. XI, "Of Impeachments", which omits any reference to "official misdemeanor", the governor and all other executive and *judicial officers* shall be liable to impeachment."

In *Field* v. *People,* 3 Ill. 79, quoted in the text of Cooley's Const. Lim., Vol. 1, (8th ed.) 139, the court says, at page 83, that "where the means for the exercise of a granted power is given, no other or different means can be implied as being more effectual or convenient." Mr. Justice Story, in *Prigg* v. *Pennsylvania,* 16 Pet. 539, at page 610, says: "And, perhaps, the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning as may fairly secure and attain the ends proposed."

The charter granted by Charles II to the Colony of Rhode Island and Providence Plantations was the fundamental law of this State until 1843. In England and here, under the charter, a judge could only be removed from office by address or impeachment. In our constitution the impeachment method was retained but no substitute was provided therein to take the place of a removal by address.

Never, to our knowledge, since the Revolution up to the time when the present act was approved on June 3, 1935, did the general assembly ever remove or even attempt to remove, either under the charter or the constitution, any judge of a court invested with the judicial power of the State during his term of office by mere legislative decree, without cause and without hearing. There are but two instances in this State before the adoption of the constitution where the general assembly undertook to interfere with a judge of such a court during his term of office. The first instance occurred in 1786, when the general assembly summoned the judges, who had declared its acts unconstitutional, to appear before it and answer for their conduct. The respondents lay great stress upon the importance of this case as a precedent of legislative power to do what the general assembly did in 1935, but we find it no authority for any such proposition.

Our conclusions in the cases at bar are illuminated by the very able opinion of Ames, C. J., in *Taylor* v. *Place*, 4 R. I. 324, which stands as a monument in the constitutional history of this State. As we have drawn inspiration from this case, we prefer to refrain from disjointed quotations and to leave it to those in interest to read that opinion in its entirety, with special reference to the discussion of the powers of government, the position of the courts in our scheme of government, and the value of previous legislative practices in interpreting our constitution. For instant purposes, we will make one exception. In refuting the argument that the general assembly had exercised some judicial power before the constitution was adopted, and that, therefore, it continued to have that power after its adoption, Chief Justice Ames, at page 361 of that opinion, says: "If, indeed, the unconstitutional exercise of a power, for so short a period as thirteen years, were to weigh with the court in so plain a case, it must be upon the strange ground that an usurpation of power, in derogation of the constitution, always, of itself, affords a constitutional

justification for the usurpation." See also *Myers* v. *United States,* 272 U. S. 52, at page 170, 171.

We are not concerned with the interpretation that the respondents may place upon the proceedings against the judges in 1786. But we are bound to take notice that those judges were given a chance to appear before the general assembly and that, after appearing and defending their position, they were not removed. We fail to see how this occurrence can be cited as a precedent for what the general assembly did in 1935.

The other instance of interference by the general assembly with a judge during his term of office was in the case of John Harris in 1809. In that instance not only were charges preferred against the judge, but every effort was made to give him a hearing up to the point of issuing a *cápias* for his appearance. When he failed to appear, Harris was *suspended* but *not removed* from office. Again we fail to see how this case can be of any assistance to the respondents. Were we inclined to indulge in inferences, we might be tempted to say that in both these cases the proceedings were more consistent with impeachment than with the exercise of an unrestrained power in the general assembly to remove a judge from office during his term. We prefer, however, to reach our conclusions from those recognized rules of construction that Story and Ames followed and which Cooley has so clearly stated. If we apply these principles in interpreting Sec. 4 of Art. X and Sec. 3 of Art. XI, we are forced to the conclusion that a judge, with a definite term and of a court instituted with constitutional sanction, can have his term abridged by the general assembly only by impeachment, unless the general assembly expressly reserved the power to act in some other manner when it fixed the term for that office. To construe the above impeachment provisions otherwise will strip these provisions of all force, it will harmfully disturb the balance of the powers of government as distributed by the constitution, and it will place the judiciary under the unrestrained

domination of the general assembly and so undermine its general efficiency. The construction urged by the respondents amounts to saying that when the people divided the powers of government under the constitution among three separate and apparently independent departments, they in reality vested the legislative branch with power to control the judges, at least of the inferior courts, by the mere exercise of the legislative will. This thought is so foreign to American constitutional government and so unjust to the people of this State both in 1842 and 1935 that we must reject it without equivocation.

The respondents further contend that because Section 1 of Art. X of the constitution provides for "such inferior courts as the general assembly may, from time to time, ordain and establish", an implied power is thereby granted to the general assembly to remove the judges of those courts whenever it chooses. We need not repeat what we have previously stated in connection with other matters that are pertinent upon this point. The power given to the general assembly by Section 1 is to "ordain and establish" inferior courts from time to time. No department can organize itself. The constitution provides in detail for the organization of the legislative power, but it delineates only the outlines of the judicial structure. The general assembly is, therefore, charged with the specific duty of providing the necessary details for that structure in which the judicial power of the State will vest by force of the constitution and not by any act of the general assembly. In *Floyd* v. *Quinn*, 24 R. I. 147, where only a question of jurisdiction was in issue, this court, at page 149, says: "A constitution does not usually deal with details. . . . Hence nothing is determined by our constitution beyond the vesting of complete judicial power in the courts and the requirement that there shall be one Supreme Court."

Section 1, Art. X, of the constitution directs the general assembly to "ordain and establish" inferior courts. That section deals only with the creation of a system and not

with men. As commonly understood, the word "ordain" means "to institute", and the word "establish" means "to make stable or firm; to fix immovably or firmly." Webster's New International Dictionary. The word "alter", which is found in similar clauses in other State constitutions, was a word in general use and its meaning well understood long before our constitution was adopted. This word was, without doubt, seriously considered and intentionally omitted from our constitution to avoid the possibility that, in the future, it might permit the general assembly to weaken and impair the stability of the inferior courts which it was bound by the constitution to ordain and establish. The absence of this or some similar word in Section 1 is strong proof of the kind of power that the people intended the general assembly to exercise in performing its delicate mission.

While the power of the general assembly to ordain and establish inferior courts is a continuing power, yet it cannot exercise that power inconsistently and at will, in utter disregard of the extent and the manner in which it may have already exercised that power. When the general assembly has fixed a definite term for a judge of an inferior court, without expressly reserving to itself the power to abridge that term, an inferential authority to remove at pleasure cannot be deduced. The existence of a defined term in itself negatives such an inference and implies a contrary presumption, that is, that the incumbent shall hold his office to the end of his term, subject to removal as provided for in the constitution. No case exactly in point has come to our attention, although a few scattered decisions of an analogous nature may be found. In *Phy* v. *Wright,* 75 Ore 428, one Henry was elected a judge in 1910, under a constitutional provision similar to our Section 1, Art. X, but which further provided that the judges of all courts should be elected for a term of four years. That same year an amendment to the constitution was adopted which increased the term to six years. In 1914, the petitioner was

elected to the office held by Henry. Upon being refused a certificate of election, on the ground that the constitutional amendment changed the term from four to six years and that Henry was still in office by virtue of that amendment, the petitioner brought *mandamus*. The court held that, as the amendment took effect during Henry's term of office, it did not extend his term. In *Strozer v. Wright,* 54 Ga. 391, the governor, acting under the power given him by the constitution of that State to appoint a judge of the Circuit Court for either four or eight years, first appointed the plaintiff for a term of four years and shortly thereafter appointed him for a term of eight years. Both appointments were duly confirmed by the senate. The court held, at page 397, that when the governor "had exercised his constitutional power of appointing a judge . . . for the term of four years, his constitutional power in relation to the appointment of a judge for that circuit during that period of time, (unless in case of a vacancy,) was *exhausted*. The governor had no more constitutional power to recall that appointment for four years, and appoint Judge Strozer for eight years than he would have had if he had appointed him for eight years, and afterwards recalled that appointment, and appointed him for four years."

In *State, ex rel. Taylor v. Mount,* 151 Ind. 679, the constitution vested the judicial power of the State in a supreme court, circuit court and such other courts as the general assembly may establish. Acting under this provision, the general assembly created an appellate court with an existence limited to six years from March 1, 1891, and with judges to be elected to serve for that same period. In 1897, the general assembly extended the court's existence for four years from January 1 of that year and also extended the term of office of the judges for that same time. The court held that the provision in the statute of 1897, which extended the term of the judges, was void as beyond the power of the legislature. At page 686 of that opinion, the court says: "But if the legislature could appoint, or continue in

office after the expiration of the term for which they have been elected, the judges of any court, that would at once, to that extent, subject the judicial to the control of the legislative department."

Inferior courts must have judges to administer the judicial power vested in them by the constitution. It is our belief, therefore, that although the general assembly is free under our constitution to use its discretion in fixing the term of office for the judges of inferior courts, yet having exercised that discretion without reservation, the general assembly exhausts its power under the constitution in respect to such term until the end of that term or unless the court system itself should be changed for the better exercise of the judicial power. In order to warrant an implied power from the power granted, the power sought to be implied must be necessarily incidental to the power granted and conducive to its beneficial exercise. *McCulloch* v. *State of Maryland*, 4 Wheat. 316. The power to arbitrarily vacate the office of a judge of an inferior court during his term of office is not necessary or incidental to the power of ordaining and establishing the structure for those courts, and, more important still, the exercise of such power is not conducive to the beneficial exercise of the power granted, but is detrimental and destructive thereof. The judiciary being an independent branch of the government under the constitution, it does not lie within the power of the general assembly to destroy its independence by indirect means under the cloak of an implied power that is supported only by skillful argumentation. We are firmly of the opinion that the general assembly has no such power without clear and express constitutional authority.

The able briefs of the parties and the attorney general, as well as our own independent search of the authorities, have failed to bring to our attention any case which holds that a judge of a court vested with the judicial power of the State, directly or indirectly by the constitution, can be summarily removed from office during his term at the

pleasure of the legislature, so long as there is no change in the court system itself. Counsel for the respondents have cited to us a large number of cases, which upon examination prove either inapplicable or clearly distinguishable. The cumulation of authorities may be impressive, but it is not convincing unless such authorities are pertinent. In their exhaustive review of our own decisions they cannot point to any case which deals with the judicial power of the State other than *Taylor* v. *Place, supra,* which held that, under the constitution, the general assembly had no judicial power and, therefore, could exercise none. Statements of legislative power made in connection with subject matter entirely different from that now before us, or pure *dicta* expressed in rather loose language, should not be given any force when dealing with so fundamental a question as the one presented in these cases. Those statements and *dicta* should be read and construed strictly in connection with the specific question actually before the court and to which the court directed both its attention and its opinion. With the exception above quoted, all of our cases deal either with the power of the general assembly in matters of jurisdiction, which power is specifically granted to it by Sec. 2 of Art. X of the constitution, as amended, or with its power to control municipal bodies, administrative boards and offices created by the general assembly for the exercise of purely governmental functions. In no instance do our cases deal with the power of the general assembly to control the courts through its judges by interfering with their term of office before the expiration of such term. We concede that the general assembly has broad, if not full, power in the former instances, but we find no constitutional warrant for the exercise of any such power in the latter instance.

The courts that are vested with the judicial power of the State are created by the constitution, even though they are instituted or ordained and established by the general assembly. It needs no argument or citation of

authority to show that the general assembly can exercise a power specifically granted to it by the constitution. Likewise, there is no doubt but that the general assembly has the power to deal at pleasure with purely administrative bodies or tribunals, created by it solely to facilitate the functions of government and in which no part of the judicial power of the State is vested under the direct mandate of the constitution. Special legislative tribunals or boards, even when given the power to perform judicial or quasi-judicial functions, do not possess any common law jurisdiction and consequently are not invested with any part of the judicial power of the State. These agencies, some of which are at times called legislative courts, are created by the general assembly for governmental purposes by virtue of the general right of sovereignty and not under or by virtue of the judiciary clause of the constitution. A legislative court, in its true sense, is a specialized court, administrative in character, not dealing with the judicial power of the State. See *American Insurance Co.* v. *Canter*, 1 Pet. 511. The district courts are clearly not of this kind or character. It is true that they are brought into existence by legislative enactment and that because of this fact they may be loosely termed statutory courts, but when they are so instituted the judicial power of the State is vested in them by the constitution, which makes them constitutional courts in the strict sense of that term.

The kind of power vested in a court, and not the way in which it is instituted or the extent of its jurisdiction, determines whether or not a court is a constitutional court. If an inferior court is vested with any of the judicial power of the State by Sec. 1 of Art. X, it is a constitutional court and not a creature of the general assembly to be dealt with summarily and at will by that body, even though it may have been instituted by statute. The respondents refer us to *Boss* v. *Sprague*, 53 R. I. 1, and direct our attention to the statement on page 3 of that opinion which says: "The Superior Court is statutory in its origin and its powers are

defined by statute and can not be extended by judicial interpretation." Disregarding both the context and the subject matter in issue, they argue that this statement is a judicial determination that all inferior courts in this State are merely legislative courts. This argument is unwarranted and unjust to the court. In that case the court was dealing with a question of jurisdiction, which the general assembly could control by virtue of Sec. 2, Art. X of the constitution as amended, and not with the judicial power of the State under Section 1 of that article. When the court there says that: "The Superior Court is statutory in its origin", it was fully justified in saying so because the Superior Court, like the district courts, is instituted by legislative enactment as a system with well-defined jurisdiction at common law. Once instituted, we again repeat that those courts are vested with the judicial power of the State by the Constitution and not by the general assembly, which is powerless in this respect. Following the words we have just mentioned, the sentence, upon which the respondents rely, says: " . . . and its" (the Superior Court's) "powers are defined by statute." In order that we may understand the true sense in which the word "powers" was used in this phrase, we must not forget that the court was then concerned only with a question of jurisdiction.

In dealing with such specific question, it never could have anticipated the distortion which is now sought to be imposed upon that sentence and upon the word "powers" in particular, otherwise it would have directly qualified that word in some way. However, both the issue then at bar and the context make it clear that the word "powers" refers to the jurisdictional powers of the Superior Court and not to the judicial power with which that court was invested by the constitution. The respondents are entitled to no advantage through misinterpretation.

The respondents in their briefs and arguments refer us to Sec. 10 of Art. IV of our constitution which reads: "The

general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution," and contend that the general assembly had the power to enact Chap. 2253, P. L. 1935, under this section. In support of their contention they cite the recent opinion of this court to the governor, in which this unique provision of our constitution was considered in connection with the power of the general assembly to call a constitutional convention, without first submitting the question of the necessity for calling such convention to the people. *In re Opinion to the Governor,* 55 R. I. 56, 178 A. 433. Previous to 1843, constitutional conventions had been held a number of times at the direct call of the general assembly. Furthermore, in the opinion of the majority of this court, the mere calling of such a convention, with proper and explicit limitations, was in accord with Section 1 of Art. I of the constitution and not in violation of any settled principle of American constitutional government. It is one thing to call a constitutional convention, quite a different thing to draft a constitution, and a far different thing from either of these two to construe the intent of a constitution that has been adopted by the people. In each case the constitutional power involved is different.

A power whose existence is invoked by reason of Sec. 10, Art. IV, must combine two necessary and indispensable elements: the power must have been previously exercised by the general assembly, and it must not be prohibited by the constitution. The power to remove a judge of any court during his term of office, unless such power is specifically reserved, has never, to our knowledge, been previously exercised by the general assembly, at least since the Revolution. An abortive attempt to exercise such a power under very different circumstances from those in the instant cases, as in the judges' case of 1786, previously discussed in this opinion and which resulted in no affirmative action by the general assembly, is no proof, but rather a denial, of the existence of any such power under the

provisions of that section. Again, even though there is no prohibition in express terms in our constitution that the general assembly shall not exercise the particular power in question, yet the existence of a power that is inconsistent with our framework of government and in conflict with its well-defined purposes is denied by that instrument as clearly as if it was stated in direct language. The distribution of the powers of government among the three departments named in Art. III of our constitution is an explicit, though implied, denial of any power which is inconsistent with such distribution. What the general assembly tried to do when it enacted Chap. 2253, P. L. 1935, is not supported by the previous exercise of any such power, and it violates Art. III by assuming a power which, in its exercise, will seriously and adversely affect an independent branch of the government.

The existence of the power claimed by the respondents for the general assembly, by implication, from the provisions of Sec. 10, Art. IV, is denied by the practice followed by the general assembly itself up to 1935. Before 1872 the magistrates courts were composed of judges, many of them laymen, elected annually by the cities and towns from among the local justices of the peace. Chapter 185, Gen. Stat. 1872, reorganizes this system by giving to it the name of justice courts and by making the election of its judges obligatory on the general assembly, in the case of certain cities and towns, and on the local authorities in others. Section 4 of that chapter provides that a justice of that court shall *"hold his office for three years, unless sooner removed by the election of some other person to fill his place."* (Italics ours.) The present district court system, under which all the judges were elected by the general assembly until the appointive power was recently given to the governor, was instituted by Chap. 597, passed on May 27, 1886, where, in Secs. 3 and 4, it is provided that the judges and clerks are to hold office for three years "unless sooner removed by the election *and qualification*

of some other person to fill his place." (Italics ours.) Both in 1872 and in 1886, the general assembly retained· control of the·three-year term which it set for the judge and clerk by an express reservation, and in 1886 it restricted such reservation of its power of removal during the term by providing that any attempted removal of a judge or clerk was ineffective until a successor was elected *and qualified.*

By resorting to a mathematical computation, based on a three-year period and starting in 1872, it is argued that because Sec. 57, Chap. 597, P. L. 1886, provides that: "For the purpose of electing justices and clerks of the district courts this act shall take effect from and after its passage", therefore, the judges of the justice courts were legislated out of office in 1886, as the district court judges were in 1935. We do not know, nor is it important to our point of view for us to ascertain, when the judges were in fact elected under the hybrid system of justice courts as instituted in 1872. In any event, such contention is unsound in that. it completely disregards the power of removal expressly reserved to itself by the general assembly in Sec. 4, Chap. 185, Gen. Stat. 1872, which continued in force until May, 1886. There is no reservation of any such power by the general assembly in Chap. 330, G. L. 1923, as amended by Chap. 1690, P. L. 1931, to abridge the definite term of six years, advisedly fixed by it without qualification, for a judge or clerk of the District Court and under which the petitioners were appointed, qualified and served.

The reserved power of removal that appears in the statutes of 1872 and in the district court act of 1886 was eliminated from Sec. 3, Chap. 8 of the Judiciary Act of 1893, where the term for both judges and clerks of the district courts is set at three years without reservation. In this relinquishment by the general assembly of its previously retained power to remove a judge or clerk during the term, we see a clear intention on the part of the general assembly to give stability to the judiciary of the district courts by

divesting itself of that power. It is pertinent to note that the general assembly did *not* then remove the judges and clerks who were in office by calling for a new election to such offices, as it might well have done under its power as reserved in Chap. 597, P. L. 1886.

In 1905, when the entire judicial structure of the State was revised by the Court and Practice Act, Sec. 115 of Chap. 9 of that act specifically provides that: "The district court in each judicial district shall be held by the justice now in office until the expiration of the term for which he was elected." The next instance of legislation affecting the judges of the district courts was in 1931, when by Public Laws Chap. 1690, the term of the judges was extended from three to six years. It is more than a mere coincidence that here again the act is expressly limited to take effect at the expiration of the term of the then incumbents. Since the creation of the district court system, the general assembly has never, before 1935, attempted to interfere with the judges of that court *during* their term of office. In the face of such interpretation of its own power by the general assembly, and for the other reasons above stated, we must reject as unsound the respondents' contention that the power to remove the judges of district courts is one of the powers reserved to the general assembly by Sec. 10, Art. IV.

As we have already indicated, most, if not all, of the cases from other jurisdictions cited by the respondents are not pertinent to the issues at bar. They deal with administrative officers or functions, or with legislative control of jurisdiction and procedure, or with special courts established for local municipal government, or with statutes passed with express constitutional warrant. The cases of *People* v. *Carr*, 86 N. Y. 512; *Kenny* v. *Hudspeth*, 59 N. J. L. 320, and *The People* v. *Olson*, 245 Ill. 288, are illustrative of these cases.

In the *Carr* case the court upheld the statute on the ground that, although the given term of a surrogate judge

was six years, he came under the constitutional provision that he should continue in office until the expiration of the term "or until the legislature should otherwise direct." In the *Hudspeth* case the court bases its opinion on the provision in the New Jersey constitution which vests the judicial power in certain specified courts "and such inferior courts as now exist and as may be hereafter ordained and established by law; which inferior courts the legislature may *alter or abolish as the public good shall require.*" (Italics ours.) The *Olson* case concerns a judge of the Municipal Court of Chicago. In the later case of *People* v. *Gill,* 358 Ill. 261, the court says that the true basis for the decision in the *Olson* case is the power of the legislature to organize and make full provision for the local municipal government of the city of Chicago. These cases and others of a similar nature give no assistance but rather tend to confuse.

The weight of a decided case as an authority depends upon its applicability and reasoning. Isolated statements from decisions which deal with entirely different issues, especially when such statements are culled from language used in *dicta* and then only by way of illustration, are not pertinent, authoritative pronouncements on an issue like the one before us. Quotations in support of Chap. 2253 from the following cases are open to this criticism. In *Conner* v. *City of New York,* 2 Sanford, 355, affirmed in 5 N. Y. 285, the issue was the right of a county clerk to the fees and emoluments of office which were denied him by a statute that changed the previous practice; in *Newell* v. *The People,* 7 N. Y. 9 the court was concerned with specific constitutional provisions regulating the appropriation and expenditure of public funds for construction work by a State agency; in *Farwell* v. *City of Rockland,* 62 Me. 296, the question before the court was whether the board of aldermen of the City of Rockland could reduce the salary of a municipal court judge during his term of office; in *Prince* v. *Skillin,* 71 Me. 361, the action of a canvassing

board in connection with the election of a county commissioner was in question; and in *Ex parte Lambert,* 52 Ala. 79, the sole issue was the power of the legislature to reduce the salary of the "Commissioner of Industrial Resources."

The obvious purpose of detached quotations from these cases, without reference to the issues there involved, is to first establish the general proposition that persons holding an office created by the legislature may be dealt with at will by that body, and then to argue that the District Court judges in these cases are subject to like control. Those who advance this argument overlook the important distinction between purely administrative officers and the judges of a court with common law jurisdiction. The former are a part of the agencies of government; the latter are an indispensable element of an independent branch of the government which is invested by the constitution with the judicial power of the State. Administrative officers for governmental purposes and judges of courts with common law jurisdiction do not fall in the same category and should not be similarly treated.

Another class of cases to which our attention has been directed by the respondents is where, under the power to ordain and establish courts, the legislature merges or abolishes one or more units of a court system, for the public good, during the term of office of a judge of the court so merged or abolished. There is a decided conflict in the authorities as to whether this can be done at all, and even those cases that support the proposition will only sustain such action where it is free from evasion and subterfuge. It is unnecessary for us to further discuss these cases as Chap. 2253, P. L. 1935, in no way changes, or affects, the court structure of the district court system.

The respondents rely upon two early Missouri cases— *State* v. *Mann,* 41 Mo. 395, and *State* v. *Pinger,* 50 Mo. 486—which the petitioners in their brief say "indicate a view at variance with our contention. The opinions are, however, so meager that it is not possible to determine

upon what reasoning the court bases its decrees." Upon reading these terse opinions, which permit the removal from office of a county judge without disturbing the office itself, we found it hard to believe that the Missouri court would dismiss an important constitutional question, if there were one, in so summary a manner. An examination of the Missouri constitution then in force—Missouri Gen. Stat. 1866, page 20—clearly explains the court's action. Section 1 of Art. VI provides that: "The judicial power, as to matters of law and equity, shall be vested in a supreme court, in district courts, in circuit courts, and in such inferior tribunals as the general assembly may, from time to time, establish." Section XXIII of that same article provides for the establishment of a county court in each county, "for the transaction of all county business" and probate matters. It seems to us that the county courts were specialized courts in the nature of administrative bodies, without equity or common law jurisdiction, and that, not being invested with any of the judicial power of the State, as defined in Section 1 of Art. VI, they were mere creatures of the legislature and, therefore, subject to its control at all times. Upon this view of such courts, we can readily explain why the Missouri court treated the *Mann* and the *Pinger* cases with the brevity that it did. The respondents are, therefore, left without any authority known to us which supports their contention that the enactment of Chap. 2253, P. L. 1935, is a valid exercise of legislative power by the general assembly.

In order to minimize the importance of the district courts in our judicial system, the issue of dual office holding and the fact that the office of a judge or clerk of such courts is a "part time job" has been injected into this case. Detailed reference by description, if not by name, is made to men who, while acting as district court judges or clerks, served either as members of the general assembly or as clerks of important committees of that body. The constitutional question before us cannot be solved by referring to the

legitimate activities of men, both living and dead, who administered the judicial power of the State with ability and unquestioned integrity, even though they may have been connected with the general assembly. Questions of policy, and of dual office holding in particular, are for the people and not for us to determine.

It is further argued that, as the district courts have no equity jurisdiction, as they cannot issue prerogative writs, as they sit without juries, and as on appeal from that court a case is tried *de novo*, such courts are really of minor, if not negligible, importance. We fail to see any force in this argument. In these cases we are concerned solely with the character of the power that the district courts exercise, and not with the district court system or its jurisdictional limitations. It cannot be denied that the district courts have substantial common law jurisdiction in both civil and criminal matters. The person and property of every individual within our territory is subject at all times to the judicial power of the State vested in these courts by the constitution within the limits prescribed by the general assembly.

The case of *McCully* v. *State*, otherwise known as the *Judges' Cases*, 102 Tenn. 509, (1899), cited by neither party in their briefs, came to our notice in the course of our own investigation. In that case, the judge of the Criminal Court of the eleventh judicial circuit was removed from office by a resolution of the general assembly passed under Sec. 6, Art. VI of the Tennessee constitution. The resolution of removal recited that economic reasons were the only cause for such action. Preceding the adoption of the removal resolution, the general assembly had passed an act abolishing the Criminal Court of the eleventh judicial circuit, but the act was expressly limited not to take effect until the expiration of thirty days from the final adjournment. McCully was tried and convicted for an infraction of the liquor laws before the judge who was removed, but who continued to act subsequent to the removal resolution

but prior to the time when the abolishing act took effect. On appeal, McCully questioned the jurisdiction of the trial court.

Article VI, Section 1 of the Tennessee constitution provided that: "The judicial power of this State shall be vested in one Supreme Court, and in such Circuit, Chancery, and other inferior courts as the Legislature may from time to time ordain and establish." Section 4 fixed the term of a circuit judge at eight years. Section 6 of that same article provided that a judge might be removed from office by a concurrent vote of both houses of the general assembly after notice, containing a copy of the cause for removal, to the judge before any such vote was taken. It further provided that the names of the members of both branches of the legislature voting for or against the judge, together with the cause or causes of removal, should be entered on the journal of each house respectively.

The different opinions rendered by the individual members of the court cover some ninety pages of the official report. The real question about which the judges disagreed and fully stated their reasons therefor was whether the power to abolish existing courts, and to increase and diminish the number, is included in the legislative power to ordain and establish them. This part of the different opinions has no application to the cases at bar. But the construction that four of the five members of that court place upon the constitutional power of the legislature to remove by concurrent resolution (pp. 512-530) is important. In deciding the question before it, the court does not rely upon the constitutional provision in respect to the judge's term, but reached its conclusion solely by a construction of the express power of removal in Sec. 6. It holds that, even though the power of removal is granted to the legislature in such broad language by the constitution, it was not unlimited and could not be exercised except for legal cause personal to the judge. This construction of the removal clause in the Tennessee constitution fur-

nishes a close analogy to the impeachment clauses in our constitution. In its discussion of this question, at page 529, the court says: "If the Legislature has such power as is contended for in the construction of this clause of the Constitution, the judiciary would no longer be an independent and coördinate branch of the government, but a mere servile dependency. But it is said, conceding the Legislature had no power to remove for the cause assigned, its action is nevertheless final and not subject to review by the judiciary. If this is so, the distribution of the powers of government and vesting their exercise in separate departments, would be an idle ceremony." If the legislature of Tennessee, acting under a power of removal by resolution so broadly stated in the constitution, had no power to remove for reasons of economy a judge from an office that continued in existence, we fail to see how the general assembly of this State had the power, in the absence of any expressed constitutional warrant, to remove the judges of all our district courts by a legislative act which left the district court system intact.

We see no reason to make any distinction between the judges and clerks of the district courts under the circumstances presented to us in the instant cases. Section 10, Chap. 330, G. L. 1923, specifically authorizes the clerks of such courts to act as judges under certain specified conditions. That same section also provides that in certain enumerated instances, their duties shall be temporarily performed by the judges of the courts. One of the objects of this section is to expedite the hearing and decision of cases. While the clerks are responsible for administrative and clerical duties in connection with the courts, yet they are enabled by legislative designation to try and determine any case at common law that falls within the jurisdiction of such courts. When so acting, they are invested with the judicial power of that court by the constitution, and not by any act of the legislature that may have designated them as one of the means through which that power might be exercised.

Chapter 2253, P. L. 1935, is in itself a most extraordinary statute. After diligent search we have failed to find one which in any way resembles it. In reading this act we must keep in mind that it was approved June 3, 1935. Section 1 by different paragraphs, but using the same language, amends Secs. 3 and 4 of Chap. 1690, P. L. 1931, which extended the term of the judges and the clerks of the district courts from three to six years at the expiration of their then term of office, as follows: "Sec. 3. *In* the month of *January* in the year *nineteen hundred thirty-two* and in the month of January in every third year thereafter, *the governor,* with the advice and consent of the senate, *shall appoint justices of the district courts,* and an associate justice of the district court of the sixth judicial district, *to hold office for the three years commencing on the first day of February next following their appointment."* (Italics ours.) The amendment of Sec. 4, Chap. 1690, P. L. 1931, which refers to the clerks of the district courts, is expressed in the same manner.

We fully appreciate that it is our bounden duty to construe the statute so as to give it an effect and force that is not obnoxious to constitutional prohibitions, and that in doing so it is to be presumed that the general assembly did not intend absurdity, inconvenience, or injustice. In applying this test, we are faced with a number of considerations which we are not at liberty to disregard in order to maintain its validity. The statute is neither procedural nor remedial. Its subject affects the administration of the law and the orderly functions of government in plain, direct and mandatory language; it commands certain actions and prescribes the manner in which they shall be done; and it is a retrospective grant of power to be exercised by the governor at a stated time, in the past, which is impossible of observance. A statute of this type, especially when it contains a grant of power, is to be strictly and literally construed. A party seeking the benefit of such a statute can take nothing by intendment, for the general

assembly is to be held to mean what it has plainly said. It is not within the power of this court to judicially sanction a meaning different from that which the words clearly imply in order to sustain its validity. See Sutherland, Stat. Const. Vol. 2, (2d ed.), Chap. XIV.

Chapter 2253, approved in June, 1935, commands that in January, 1932, "the governor . . . shall appoint" the judges and clerks of the district courts for a term of three years commencing February 1, 1932. But in January, 1932, within the time set by law, another governor, acting in obedience to Sec. 2, Art. VII, of our constitution, which says that: "The governor shall take care that the laws be faithfully executed," had in fact and in compliance with the provisions of Chap. 1690, P. L. 1931, appointed the judges and clerks of the district courts for a term of six years commencing February 1, 1932. Reading Chap. 2253 as expressed and giving to its words their plain and literal meaning, as we are bound to do, we cannot conceive how a governor in 1935 can perform an act in 1932, unless, by some unknown means, time that has passed can be recalled. Neither can we find any justification for the general assembly to invalidate an official act of a former chief executive, duly performed in accordance with law, by a retrospective grant of power that is impossible to exercise as expressed. Chancellor Kent, in Vol. 1, page 455, of his Commentaries, says that retrospective statutes "are very generally considered as founded on unconstitutional principles, and consequently inoperative and void." Chapter 2253 is not only retrospective and impossible of performance according to its literal expression, but it also attempts to nullify an act of a former governor, performed by him in obedience to Sec. 2, Art. VII of our constitution and in strict compliance with the provisions of Chap. 1690, P. L. 1931, as the chief executive of an independent branch of the government. In our opinion, the statute now before us is the type of legislation which is unconstitutional as a retrospective statute, and falls squarely within the reservation that we so clearly

96

made in *The Prata Undertaking Co.* v. *State Board of Embalming,* 55 R. I. 454, at page 470.

We repeat what we said earlier in this opinion, that a statute should not be declared unconstitutional unless those who urge its unconstitutionality clearly establish that fact beyond a reasonable doubt. In these cases, it is our opinion that the petitioners have sustained this burden.

After long reflection, with a full realization of the delicate and important duty before us, we are constrained to conclude that Chap. 2253, P. L. 1935, is invalid as a statute because of uncertainty and impossibility of observance, and further, that it is unconstitutional in that it is inconsistent with and violative of Art. III, Art. X, Sections 1 and 4, and Art. XI, Sec. 3 of the constitution of this State.

We are of the opinion that the petitioners were illegally ousted from their respective offices as judges and clerks of the district courts, and that, therefore, the prayer of the petitioner in each case should be granted.

*Ira Lloyd Letts,* for petitioners.

*Philip S. Knauer, Thomas F. Cooney,* for respondents.

*John P. Hartigan,* Attorney General, *Michael De Ciantis,* 3rd Asst. Atty. Gen., *John E. Mullen,* 4th Asst. Atty. Gen., *amici curiae.*